The SAENGER ORGANIZATION, INC., Plaintiff, Appellee,

v.

NATIONWIDE INSURANCE LICENSING ASSOCIATES, INC., Commonwealth Licensing Group, and Lawrence R. Durkin, Defendants, Appellants.

No. 96–2197.

United States Court of Appeals, First Circuit.

Heard April 9, 1997.

Decided July 18, 1997.

Ernest B. Murphy, with whom Murphy & O'Connell, was on brief, for appellants.

David J. Byer, with whom Testa, Hurwitz & Thibeault, LLP, Stephen J. Kenney, Medway, MA, and Kenney & Maciolek, were on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

This copyright infringement case revolves around a dispute over who owns the copyrights in insurance licensing texts and manuals that were created in 1986. It comes to us on appeal from the district court's grant of summary judgment in favor of plaintiff-appellee, The Saenger Organization, Inc. ("Saenger"), and against defendants-appellants Lawrence R. Durkin, Nationwide Insurance Licensing Associates, Inc., and Commonwealth Licensing Group (collectively "Durkin"). Durkin argues that the district court improperly found that no genuine issue of material fact existed as to Saenger's ownership of valid copyrights in the manuals and Durkin's infringement of them. Thus, Durkin contends that the district court wrongly concluded that Saenger was entitled to judgment in its favor as a matter of law. Durkin

further argues that the district court incorrectly determined that the applicable Massachusetts statutes of limitations and frauds barred his state law counterclaims against Saenger alleging fraud, breach of agreement, and unfair and deceptive business practices. For the reasons that follow, we affirm the district court's rulings.

### Standard of Review

 We exercise plenary, *de novo* review of a district court's entry of summary judgment. *See Ortiz–Pinero v. Rivera–Arroyo*, 84 F.3d 7, 11 (1st Cir.1996). Summary judgment is appropriate where there are no genuine disputes as to material facts and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). We review the record evidence in the light most favorable to the non-moving party, and thus draw all reasonable inferences and resolve factual disputes in favor of the party against whom summary judgment has been entered, in this case, the defendants-appellants. *See Den Norske Bank v. First Nat'l Bank of Boston*, 75 F.3d 49, 53 (1st Cir.1996).

### Background and Prior Proceedings

The Saenger Organization has been in the business of publishing insurance licensing texts and manuals since 1986. Durkin worked for Saenger from 1986 until 1992, during which time he was an officer and vice president of the corporation. Since 1993, Durkin, now the principal of both Nationwide Insurance Licensing Associates and Commonwealth Licensing Group, has been independently in the business of publishing insurance licensing texts and manuals.

According to Durkin, he and Saenger reached an oral agreement in April 1986 as to work that Durkin would do for Saenger. Saenger disputes the existence of any unwritten agreement, but concedes that we must view the record evidence in the light most favorable to Durkin for purposes of this appeal and the underlying motion. According to Durkin, the work responsibilities he undertook in the April 1986 oral agreement included the development of a property and casualty insurance licensing manual, a life and health insurance manual, and several state law supplements. Durkin maintains that the alleged oral agreement contained the following terms: Durkin was to begin immediately to develop, update, and expand these manuals and supplements for Saenger, which would market them; he would become Saenger's vice president immediately upon completion of an existing employment commitment to another firm; he and Saenger would be co-authors of the materials that Durkin would write and co-owners of the copyrights in those materials; and, he would be paid a base salary of $42,000 per annum plus 50 percent of the net revenues of the materials he worked on, with the computation and sharing of such net revenue to begin in June 1987 and to continue in each succeeding fiscal year. Durkin promptly began to work part-time (nights and weekends) on the manuals—as he and Saenger had agreed— even though he was still employed by Educational Training Systems ("ETS"). Durkin and Saenger continued with this work arrangement for several months until Durkin assumed full-time work duties at Saenger's offices in July 1986.

Two of the insurance licensing texts that Durkin worked on during his relationship with Saenger were manuals that came to be titled *Life, Accident and Health Licensing Text* and *Property/Casualty Licensing Text* (hereinafter *"Life"* and *"Property"* respectively). Durkin claims he authored these works in their entirety, while Saenger contends that Durkin merely expanded and updated previously developed Saenger manuals. In any event, on or about November 26, 1986, Saenger submitted an application for copyright registration, a Form TX, for *Property* with the United States Copyright Office. About two days later, Saenger submitted a similar application for *Life*.[1]

The *Property* application listed July 16, 1986 as the work's first date of publication and indicated that it was a "work made for hire" by the work's co-authors, which the application listed as Bruce W. Saenger (The Saenger Organization's principal) and Law-

---

1. Durkin claims that the *Property* application, while submitted to the Copyright Office in November 1986, was filled out in his presence on or about July 16, 1986.

rence R. Durkin. The application indicated that The Saenger Organization was the hiring party for whom the work was made and was the sole claimant of copyright protection. The Copyright Office responded to the application with a letter dated January 23, 1987, notifying Saenger that "[i]f an individual contributes to or creates a work in his or her capacity as either an officer or employee of a company or organization, the work is considered a 'work made for hire' and the employer should be named as the author rather than the individual." In response to this letter, Saenger completed and submitted a second application for the same work, i.e., *Property,* again listing The Saenger Organization as the sole copyright claimant, but this time also listing it alone as the work's author. On the basis of this second application, which the Copyright Office received on February 24, 1987, the Copyright Office issued Saenger a copyright for *Property* (registration number TX 2–011–625), which listed November 26, 1986 as the effective date of registration.

Like the initial *Property* application, the first application that Saenger submitted for *Life* listed Bruce W. Saenger and Lawrence R. Durkin as the authors of the work, indicated that it was a "work made for hire," and stated that The Saenger Organization, the copyright claimant, was the hiring party for whom the work had been made. Interestingly, the Copyright Office responded to this application prior to responding to the earlier *Property* application. By a letter dated December 24, 1986, the Copyright Office notified Saenger that "[w]here a work is 'made for hire,' the employer is considered the author and should be [so] named [on the copyright application.]" In response to this letter, Saenger completed and submitted a second application for the same work, i.e., *Life,* this time listing The Saenger Organization alone as the work's author. On the basis of this second application, which the Copyright Office received on January 16, 1987, the Copyright Office issued Saenger a copyright for *Life* (registration number TX 1–983–136), which listed November 28, 1986 as the effective date of registration.

During the period of time when these applications were pending, Durkin asked Saenger about the applications' status. Some time after the Copyright Office sent Saenger the copyright registrations for *Property* and *Life* (the record is not clear precisely when), Saenger informed Durkin that the copyrights had "come in from the Office." Durkin did not ask to see, nor did he see, the copyright registrations or any of the applications submitted to the Copyright Office prior to an incident which occurred in April 1992. According to Durkin, while looking through some files in the clerical area at Saenger, he inadvertently encountered a file entitled "COPYRIGHT INFO." He looked inside the file and discovered copies of the applications and the letters described above. According to Durkin, he brought the file to Bruce Saenger's office and demanded an explanation for why he was not listed as a copyright owner, demanded his share of the copyright and copyright revenues, and expressed his view that the copyright registrations amounted to a violation of their oral agreement. Saenger denies that such a confrontation ever took place.

Prior to leaving Saenger in September 1992, Durkin avers that he had regular and frequent discussions with Bruce Saenger concerning the copyright and revenue issues, something Saenger denies. Durkin states that Saenger repeatedly promised him that he would "get around to" changing the copyright to name Durkin as a co-author and co-owner and would make an accounting for monies owed Durkin as a result of revenues attributable to fiscal years 1989 to 1992.

Durkin admits that after he left Saenger in September 1992 he copied substantial portions of both *Life* and *Property* and used them in his own text, *Fundamentals of Life, Accident, and Health Licensing Text* (hereinafter "*Fundamentals*"). Saenger became aware of Durkin's activities in April 1994. The following month, Saenger advised Durkin to discontinue copying and publishing the written material in question, as it was copyrighted by Saenger. Durkin, however, persisted in publishing and distributing the material. Shortly thereafter, Saenger filed suit in federal district court. The district court preliminarily enjoined publication and distribution of the Durkin materials and entered

summary judgment for Saenger on both its copyright infringement claims and Durkin's state law counterclaims. This appeal ensued.

### The Copyright Infringement Issue

■ The plaintiff in a copyright infringement case bears the burden of proving " '(1) ownership of a valid copyright, and (2) [unauthorized] copying of constituent elements of the work that are original.' " *Lotus Dev. Corp. v. Borland Int'l, Inc.,* 49 F.3d 807, 813 (1st Cir.1995), *aff'd by an equally divided court,* —— U.S. ——, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996) (quoting *Feist Public'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991)); *see also CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.,* 97 F.3d 1504, 1513 (1st Cir.1996). Only the first of these two prongs is at issue in this case because Durkin does not deny or dispute that he copied the pertinent material from *Property* and *Life* without any authorization from Saenger. Thus, the only issue before us is whether Saenger's copyrights for *Property* and *Life* are valid.

■ To show ownership of a valid copyright, a plaintiff bears the burden of proving that the work, when viewed as a whole, is original and that he has complied with the requisite statutory formalities. *See Lotus,* 49 F.3d at 813. " 'In judicial proceedings, a certificate of copyright registration constitutes *prima facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate why the copyright is not valid.' " *Id.* (quoting *Bibbero Sys., Inc. v. Colwell Sys., Inc.,* 893 F.2d 1104, 1106 (9th Cir. 1990)); *see also* 17 U.S.C. § 410(c); *CMM Cable,* 97 F.3d at 1513.

■ In this case, Saenger succeeded in shifting the burden regarding the validity of its copyrights in *Life* and *Property* by producing copyright registration certificates. Durkin attempted to meet the repositioned burden of proof by arguing that Saenger's copyrights were obtained by misrepresentation and are, therefore, invalid. We, like the district court, do not find this argument persuasive.

The crux of Durkin's theory is that the oral agreement he allegedly entered into with Saenger in April 1986, which Durkin characterizes as a partnership agreement, undermines the validity of Saenger's copyrights in *Life* and *Property.* Specifically, Durkin alleges that he and Saenger orally agreed in April 1986 that he was to develop written materials for Saenger and that he and Saenger would be co-authors and co-owners of the copyrights in those materials, including those now titled *Life* and *Property.* Thus, Durkin argues that Saenger's copyrights are invalid because they violate the terms of the April 1986 oral agreement and because the copyright applications that Saenger submitted contained information other than that which Saenger agreed they would contain as to ownership of the copyrights. Saenger contests the veracity of Durkin's various allegations, but concedes that they must be assumed to be correct for the purposes of this appeal. Even so, Durkin's argument encounters several difficulties.

The Copyright Act of 1976 provides that copyright protection generally attaches to the person who actually creates a work. *See* 17 U.S.C. § 201(a) ("Copyright in a work ... vests initially in the author or authors of the work. The authors of a joint work are coowners of copyright in the work."). "The Act carves out an important exception, however, for 'works made for hire.' " *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989) [hereinafter *CCNV* ]. Where "a work [is] made for hire," the Act provides that "the employer or other person for whom the work was prepared is considered the author" and owns the copyright "unless the parties have expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b).

As for the scope of this exception to the general rule regarding copyright ownership, the 1976 Act, in relevant part, provides that a "work [is] made for hire" if it is either:

> (1) a work prepared by an employee within the scope of his or her employment; or

> (2) a work specially ordered or commissioned for use as ... a supplementary

work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

17 U.S.C. § 101.

In this case, the parties agree that they did not sign a written instrument stating that the materials that Durkin prepared for Saenger would be considered works made for hire. Accordingly, *Life* and *Property* can be considered "works made for hire" only if they satisfy the requirements of section 101(1), that is, if they were prepared by Durkin within the scope of his employment with Saenger.

The Copyright Act nowhere defines the key terms "employee" or "scope of employment." *See CCNV*, 490 U.S. at 739, 109 S.Ct. at 2172; Melville B. Nimmer & David Nimmer, 1 *Nimmer on Copyright* § 5.03[B][1] at 5–14.2 (1996). In *CCNV*, the Supreme Court resolved four conflicting judicial interpretations of these terms, *see* 490 U.S. at 738–39, 109 S.Ct. at 2171–72, by construing them to mean the "conventional master-servant relationship as understood by common-law agency doctrine." *Id.* at 740, 109 S.Ct. at 2172. The resulting directive from the Court is unambiguous: "To determine whether a work is [made] for hire under the Act, a court first should ascertain, using principles of [the] general common law of agency, whether the work was prepared by an employee or an independent contractor. After making this determination, the court can apply the appropriate subsection of § 101." *Id.* at 750–51, 109 S.Ct. at 2178. The Court provided a nonexhaustive list of factors courts should use "[i]n determining whether a hired party is an employee under the general common law of agency." *Id.* at 751, 109 S.Ct. at 2178. This list includes the following:

the hiring party's right to control the manner and means by which the product is accomplished .... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* at 751–52, 109 S.Ct. at 2178–79 (footnotes omitted) (citing Restatement (Second) of Agency § 220(2) (1958)). The Court completed its discussion of these factors by cautioning that "[n]o one of these factors is determinative." *Id.* at 752, 109 S.Ct. at 2179.

Under this standard, the appellate record indicates that Durkin cannot escape the reasonable inference that he prepared these texts both while he was a Saenger employee and within the scope of his employment with Saenger. The evidence demonstrates that the overwhelming majority of the agency factors that the *CCNV* Court highlighted point to the existence of an employment relationship between Durkin and Saenger.

For instance, on Durkin's version of events, he and Saenger recognized that he had some remaining work obligations to another organization, ETS, but agreed in April 1986 that he would begin to work on these texts immediately. Specifically, they agreed that Durkin would work nights and weekends on developing the manuals, prior to his being able to assume his full-time position as Saenger's vice president in July 1986. Thus, a fair reading of Durkin's own affidavit indicates that the agreement he reached with Saenger addressed the issues of when and how long he would work on the manuals even as to the period of time between April and July 1986. In Durkin's words, "Even though I was employed by another organization at the time [*viz.*, April 1986], Saenger and I agreed that I would develop these manuscripts ... in the evenings and on weekends." Under *CCNV*, this feature of the Durkin–Saenger agreement points towards the existence of an employment relationship.

Furthermore, regardless whether Durkin actually wrote the manuals from scratch (as he alleges) or merely contributed to them by

modifying and expanding pre-existing material (as Saenger counters), it is undisputed that Durkin performed this work for Saenger and at its specific behest. Despite his arguments to the contrary, Durkin's affidavit in opposition to the preliminary injunction indicates that Saenger retained a right to control the manner and means by which the contested works—*Life* and *Property*—were produced. This feature of the Durkin–Saenger relationship, too, militates in favor of a finding of employee status.

Specifically, Durkin swears that, pursuant to the alleged April 1986 oral agreement, Durkin "would develop" written material, Saenger "would process" this material, and Durkin would subsequently "edit and proofread" the text prior to printing. Indeed, the record indicates that Saenger's office was an important source of the instrumentalities, tools, and human resources used in producing the works in question. According to the affidavit of Nancy Nisil, a word processing clerk at Saenger, Nisil received handwritten sheets of paper from Durkin during the months of April and May 1986 "on an almost daily basis . . . *which I converted into Property . . . and Life* . . . which were later to my knowledge published by The Saenger Organization." (emphasis added). Nisil's affidavit is corroborated by that of another Saenger word processing clerk, Tina Petitt, which relates that she too received handwritten sheets of paper from Durkin during April and May 1986 "on an almost daily basis" that she "*converted into Property . . . and Life.*" (emphasis added). The use of Saenger word processing equipment and personnel in the production of the works in question, and the level of Saenger control over the means of their production that such use entails, suggests the existence of an employer-employee relationship between Saenger and Durkin.

■ The understanding of the parties as to the nature of their relationship is also probative of the existence of a conventional master-servant relationship as understood by common law agency doctrine. *See* Restatement (Second) of Agency § 220(2)(i) (noting that "whether or not the parties believe they are creating the relation of master and servant" is a matter to be considered, among others, in determining whether one acting for another is a servant or an independent contractor). While Durkin would have us believe that the April 1986 oral agreement was a partnership agreement, the record evidence fails to substantiate this theory. On the contrary, the record facts indicate that Durkin himself understood the April 1986 oral agreement to constitute an agreement regarding his employment with Saenger.

Turning again to his preliminary injunction affidavit, Durkin's words on this point are illuminating, albeit not in the way he would like us to understand them: "*Even though I was employed by another organization at the time* [*viz.*, April 1986], *Saenger and I agreed that I would develop these manuscripts . . . in the evenings and on weekends.*" (emphasis added). Durkin's use of the word "another" is pregnant with meaning in the context that confronts us. The dictionary defines the adjective "another" as "different or distinct from the one first named or considered," and as "being one more in addition to one or a number of the same kind." *Webster's Third New International Dictionary* 89 (1986). When Durkin refers to his employment with another organization (i.e., ETS), it would appear that he understood the April 1986 oral agreement to have provided him with a new employment relationship with Saenger, even as to the period of time between the April agreement and his assumption of full-time duties as Saenger's vice president in July 1986. Durkin appears to argue that he could not have been Saenger's employee from April to July because he was an ETS employee during that period. Durkin's own affidavit, however, demonstrates that he understood the April agreement with Saenger as providing him with a part-time job that would entail evening and weekend work commitments in addition to the responsibilities associated with his other, full-time position with ETS. Durkin's affidavit further establishes that both he and Saenger agreed that this moonlighting arrangement would continue until Durkin discharged his remaining commitment to ETS and thus became able to assume full-time work responsibilities as Saenger's vice president. Importantly, this view of the matter is one to which Durkin himself subscribes. In his own affidavit as to eco-

nomic loss, Durkin describes himself with the following words: "I am a former *employee* of The Saenger Organization." (emphasis added).

Durkin's own apparent understanding of his relationship with Saenger thus suggests a finding of employee status. So, too, does the duration of his work relationship with Saenger (some six years); the method of payment used during this six-year period (the provision of a time-based, biweekly salary following the completion of his employment with ETS); and, the provision of employee benefits. Durkin's tax treatment also points to the existence of employee status. Durkin had both federal and state taxes withheld from his Saenger paychecks, received W–2 forms for his salary, and received 1099 miscellaneous forms for any bonuses that he received. Finally, there is no dispute that Durkin's work for Saenger was part of Saenger's regular business, a factor that likewise suggests the existence of an employment relationship. The only *CCNV* factor that works in Durkin's favor is the level of skill that was presumably required to develop these works, but this does not alter the reality that the overwhelming majority of the agency factors highlighted by the *CCNV* Court point to the existence of an employment relationship between Durkin and Saenger.

On these undisputed facts, the district court was correct to conclude that no reasonable juror could find in Durkin's favor either that he was not employed by Saenger or that *Life* and *Property* were not prepared by him within the scope of his employment with Saenger. Durkin's arguments to the contrary are unavailing.

First, we cannot agree with Durkin's contention that the April 1986 oral agreement "essentially moot[s]" the question of whether *Life* and *Property* fall within the statutory definition of works made "for hire." This view of the matter does not comport with either 17 U.S.C. § 101 or the Supreme Court's ruling in *CCNV*.

Second, even if one assumes that Durkin and Saenger entered into the April 1986 oral agreement that Durkin describes, Durkin's legal theory that the agreement constituted a partnership agreement is unsupported by the record evidence. While Durkin's affidavit as to economic loss *characterizes* the alleged oral agreement as a "partnership agreement" between himself and Bruce Saenger, on closer inspection that conclusory characterization does not represent additional record evidence on the matter, but only amounts to Durkin's "spin" on the facts.

Thus, Durkin himself describes the oral agreement in his preliminary injunction affidavit only as one that delineated employment responsibilities and payment issues. Nowhere in the record does Durkin describe the agreement as one that even mentioned the concept or elements of partnership. Most significantly, Durkin's own description of the April 1986 agreement makes no mention of an intent by the alleged principals to form a partnership. *See, e.g., Cardullo v. Landau,* 329 Mass. 5, 105 N.E.2d 843, 845 (1952) (indicating that a partnership under Massachusetts law is generally held to exist only where such is the intent of the parties). On the contrary, "[t]he language throughout the agreement was that of employment and not of partnership." *Walsh v. Atlantic Research Assocs.,* 321 Mass. 57, 71 N.E.2d 580, 584 (1947). As Durkin explains in his affidavit, the agreement provided that "*I would come to work for TSO* [i.e., Saenger] *as a Vice President.*" (emphasis added). Especially where it is undisputed that Durkin was not a co-owner with Bruce Saenger of The Saenger Organization, we cannot agree that a finder of fact could reasonably infer from this manifestation of intent that the parties intended to form a partnership relationship. *See, e.g., Shain Inv. Co. v. Cohen,* 15 Mass.App.Ct. 4, 443 N.E.2d 126, 129 (1982) (indicating that members of a partnership are co-owners of a business, not just of a work product, thereby distinguishing them from individuals in other kinds of joint enterprises).

The core of Durkin's partnership argument would appear to be his contention that Saenger was to pay him "[f]or his work" in developing and marketing the manuals by providing him with an annual $42,000 salary and an equal share of the net revenues from the manuals he worked on. This net revenue sharing, Durkin argues, evidences the exis-

tence of a partnership between himself and Saenger. But, even if we assume the allegation about revenue sharing to be true, such an arrangement about how Durkin would be paid *for his work* would do little to substantiate Durkin's partnership theory because venerable and established law provides that one who is only interested in the profits of a business as a means for compensation for services rendered (i.e., for his work) is not a partner, but rather someone akin to a contractual creditor. *See Phipps v. Little,* 213 Mass. 414, 100 N.E. 615, 615–16 (1913); *Estabrook v. Woods,* 192 Mass. 499, 78 N.E. 538, 540 (1906) (refusing to find a partnership, despite a profit sharing arrangement, where the arrangement was essentially compensatory in nature and the party alleging the existence of a partnership "had no right to take control of the business ... or to interfere in the management of it," even in the event of non-payment); *see also* Mass. Gen. Laws ch. 108A, § 7(4)(a) & (b) (providing that "[t]he receipt by a person of a share of the profits of a business" is not "prima facie evidence that he is a partner" where "such profits were received in payment" of, among other things, "a debt by instalments or otherwise" or "[a]s wages of an employee").

Finally, the "partnership distributions" that Durkin alleges to have received as his share of the "partnership's" revenue from the copyrighted works in question were not treated as royalties on his 1099 miscellaneous federal income tax forms, and were, in fact, treated as compensation payments—not as partnership distribution income on K–2 forms—for tax purposes. As Saenger correctly points out, "[a]ll other references relating to the so-called partnership agreement are lawyer argument." Without evidence to support it, Durkin's conclusory legal opinion that the oral agreement was a partnership agreement cannot serve as a basis for a reasonable trier of fact to find that the agreement, if it existed, constituted a partnership agreement. In view of the overwhelming factors present in the record favoring a finding of employee status, we do not see any reason to view this case, as Durkin would have us, through the rubric of *Oddo v. Ries,* 743 F.2d 630 (9th Cir.1984), a case that

deals with the rights of partners in copyrights held by their partnership.

Therefore, to the extent that Durkin was the actual author of *Life* and *Property,* either in part or in their entirety, under *CCNV* and 17 U.S.C. § 101, these works fall within the category of "works made for hire." Under the work-for-hire doctrine, as the Copyright Office correctly explained to Saenger, "[i]f an individual contributes to or creates a work in his or her capacity as either an officer or employee of a company or organization, the work is considered a 'work made for hire' and the employer ... [is considered] the author rather than the individual." This scenario fully pertains here.

As indicated, where "a work [is] made for hire," federal copyright law provides that "the employer or other person for whom the work was prepared" owns the copyright "unless the parties have expressly agreed otherwise in a *written* instrument signed by them." 17 U.S.C. § 201(b) (emphasis added). In light of this statutory language, the fact that there is no *written* agreement between the parties regarding ownership of the copyrights in *Life* and *Property* is dispositive regarding the validity of Saenger's copyrights. Durkin's protestations about the alleged *oral* agreement with Saenger concerning the ownership of these copyrights is thus entirely beside the point. On these facts, and given that Durkin conceded that he copied material from *Life* and *Property* without Saenger's authorization, the district court correctly concluded that Saenger was entitled as a matter of law to judgment in its favor on its copyright infringement claim. *See Feist,* 499 U.S. at 361, 111 S.Ct. at 1295–96; *CMM Cable,* 97 F.3d at 1513; *Lotus,* 49 F.3d at 813.

### The State Law Counterclaims

After Saenger brought its copyright infringement suit in federal court, Durkin filed state law counterclaims against Saenger alleging breach of agreement, fraud, and unfair and deceptive business practices (the latter under Mass. Gen. Laws ch. 93A) on the ground that Saenger wrongfully obtained its copyrights in *Life* and *Property* by misrepre-

senting itself as the author of the works, and thereafter failed to pay Durkin his share of the revenues from those works, pursuant to the alleged April 1986 oral agreement. The district court entered summary judgment for Saenger on these claims on the basis that they were barred by the Massachusetts statute of limitations and statute of frauds. Durkin appeals these determinations. For the reasons that follow, we agree with the result reached by the district court.[2]

We begin by noting that a six year statute of limitations applies in Massachusetts for breach of contract actions. *See* Mass. Gen. Laws ch. 260, § 2. A shorter four year statute pertains to chapter 93A actions claiming unfair and deceptive business practices, *see* Mass. Gen. Laws ch. 260, § 5A, while an even shorter three year statute of limitations pertains to causes of action alleging fraud. *See* Mass. Gen. Laws ch. 260, § 2A.

■■■■ Under Massachusetts law, an action for breach of contract generally accrues at the time of breach, thereby triggering the statute of limitations for purposes of determining whether a claim is time-barred. *See International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass.App. Ct. 215, 560 N.E.2d 122, 126 (1990) (citing *Campanella & Cardi Constr. Co. v. Commonwealth*, 351 Mass. 184, 217 N.E.2d 925 (1966) and *Boston Towboat Co. v. Medford Nat'l Bank*, 232 Mass. 38, 121 N.E. 491 (1919)). Durkin's counterclaim regarding Saenger's breach of the alleged oral agreement would be time-barred under this standard rule inasmuch as the breach, on Dur-

kin's version of events, occurred either in July 1986, when Saenger improperly completed the initial copyright applications, or November 1986, when Saenger submitted the applications to the Copyright Office and thus "fraudulently" secured copyright registrations dated effective as of that month and date. *See* 17 U.S.C. § 410(d) (governing the effective date of a copyright registration). On either contingency, Durkin's breach of contract claim, his chapter 93A action, and his vaguely asserted fraud cause of action would be time-barred because they were not filed until August 1994, thereby falling outside the respective six, four, and three year limitations periods.

■■■■ Durkin concedes as much and urges us, as he urged the district court, to accept his theory that the Massachusetts "discovery rule" applies to his situation. The discovery rule can operate to delay the accrual of a cause of action because it provides that "[a] cause of action will accrue when the plaintiff *actually knows* of the cause of action *or when the plaintiff should have known* of the cause of action." *Riley v. Presnell*, 409 Mass. 239, 565 N.E.2d 780, 785 (1991) (emphasis added). Durkin argues that the district court wrongly granted summary judgment for Saenger because, as a matter of Massachusetts law, he was entitled to an opportunity to persuade a jury that he actually knew or should have known of Saenger's allegedly wrongful conduct on a date that would make his August 1994 filing timely under the statute of limitations. In support of this contention, Durkin quotes *Riley* for the proposition that "where, as here, the

2. While the Copyright Act expressly preempts all causes of action that fall within its scope, with a few narrowly drawn exceptions, *see* 17 U.S.C. § 301; *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1164–65 (1st Cir.1994), and while the district court's preliminary injunction ruling referred to this fact, *see Saenger Org., Inc., v. Nationwide Ins. Licensing Assocs., Inc.*, 864 F.Supp. 246, 250 n. 4 (D.Mass.1994), the preemption issue was not briefed or argued on appeal. We need not reach the question of whether Durkin's state law theories of recovery—all of which in some manner address themselves to the question of who owns the copyrights in *Life* and *Property*—are equivalent to protections afforded by federal copyright law, and are thus preempted, because our analysis today indicates that Durkin's asserted state claims are not viable in

any event. The issue is not purely academic, however, and we note that at least one federal court that has addressed a similar situation has found preemption. *See Miller v. CP Chemicals, Inc.*, 808 F.Supp. 1238, 1246 (D.S.C.1992) ("The Copyright Act affords a presumption to the employer, under the work for hire doctrine, that the employer shall receive the copyright, and that such presumption will not be rebutted except by a writing signed by the employer. If the employee can bring a lawsuit under state law based upon an alleged oral promise, then the presumptions created under the Copyright Act would be substantially, if not, totally undermined. The court finds that the plaintiff's breach of employment contract is an artful restructuring of the copyright claim and is, therefore, preempted.").

plaintiff has claimed a trial by jury, any disputed issues relative to the statute of limitations ought to be decided by the jury." *Id.* 565 N.E.2d at 787.

Specifically, Durkin's theory is that he did not know in actual fact of Saenger's wrongful behavior until April 1992 when, one day, he accidentally came across the file labelled "COPYRIGHT INFO." Moreover, Durkin contends that there was no reason that he should have known of Saenger's fraud, breach of agreement, or deceptive and unfair business practices before then because he reasonably and justifiably relied on Saenger's representations regarding ownership of the copyrights. On Durkin's view of the matter, Saenger was his partner and therefore Durkin had every reason to believe that Saenger would do what he agreed to do about the copyrights and had no reason to believe that he (Saenger) would do otherwise.

Durkin's theory lacks merit. "Under the Massachusetts discovery rule, the running of the statute of limitations is delayed while 'the facts,' as distinguished from the 'legal theory for the cause of action,' remain *'inherently unknowable'* to the injured party." *Catrone v. Thoroughbred Racing Ass'ns of N. Am., Inc.,* 929 F.2d 881, 885 (1st Cir.1991) (emphasis added) (quoting *Gore v. Daniel O'Connell's Sons, Inc.,* 17 Mass.App.Ct. 645, 461 N.E.2d 256, 259 (1984)); *see also Williams v. Ely,* 423 Mass. 467, 668 N.E.2d 799, 804 n. 7 (1996) ("Some of our opinions have stated that a plaintiff seeking to show that the statute of limitations did not begin to run must demonstrate that the claim was *'inherently unknowable,'* a standard that is no different from, and is used interchangeably with, the 'knew or should have known' standard.") (emphasis added) (construing *Riley* ). Durkin does not contend that the facts he discovered in April 1992 were somehow inherently unknowable to him so much as he argues that they were unknown to him. Therefore, despite his protestations to the contrary, Durkin's state law counterclaims are all time-barred on the basis of the undisputed facts and the applicable Massachusetts

law. This conclusion is reached no matter how one chooses to view the issue.

First, although there is some dispute as to when in 1986 the initial copyright application was completed, it is undisputed that sometime in 1986 Durkin was present in the room when Saenger drafted the application which listed The Saenger Organization alone as the copyright's owner. Because Durkin was not listed as a co-owner, as Durkin alleges Saenger had agreed he would be, Saenger breached the oral agreement in Durkin's presence in 1986.[3] If Durkin saw the document at that time, then he was aware of the breach and the statute of limitations was duly triggered. Durkin, however, denies seeing the application and instead argues that he did not bother to look at it or to examine whether the information contained therein was correct or not. Durkin justifies his actions (or rather, inaction) by arguing, in essence, that he felt fully justified in relying on Saenger, a partner, to do what they had agreed. As our previous discussion explains, there is no evidence that Durkin and Saenger entered into a partnership agreement, and certainly not in the legal sense of that term. Even if we assume such an agreement, Durkin's deliberate indifference to what was contained in the copyright applications—information that was inherently *knowable* to him—cannot serve to toll the running of the statute of limitations. *See Ely,* 668 N.E.2d at 804 n. 7 (describing the Massachusetts standard for determining when a plaintiff can avail himself of the discovery rule).

Durkin's reliance on *Riley* is thus misplaced because that case does not vitiate the standard rule that a "nonmoving party can fend off a motion for summary judgment [only] by setting forth specific facts sufficient to demonstrate that every essential element of its claim or defense is at least trialworthy." *Catrone,* 929 F.2d at 884. That standard is not met here. Under Massachusetts law, "[t]he plaintiff bears the burden of presenting facts sufficient to take the case outside the statute of limitations." *Id.* at 885 (citing *Franklin v. Albert,* 381 Mass. 611, 411 N.E.2d 458, 463 (1980)). Here, there is no

---

**3.** We primarily analyze the facts against Durkin's contract theory of recovery because that cause of action has the most generous limitations period (*viz.,* six years).

trialworthy issue as to the statute of limitations question because there is not "enough evidence for a jury to return a verdict for the nonmoving party." *Id.* at 884–85 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). No reasonable juror could fail to find that Durkin should have known the facts underlying his cause of action for breach of agreement, or that such facts were knowable to him, *see Catrone,* 929 F.2d at 885; *Ely,* 668 N.E.2d at 804 n. 7; *Gore,* 461 N.E.2d at 259, at the time in 1986 that the application was drafted in his presence with the prejudicial omission of his name.

Second, it is undisputed that Saenger applied for and received copyright registration certificates for *Life* and *Property* from the Copyright Office. Under federal copyright law, recordation of a document in the Copyright Office "gives all persons constructive notice of the facts stated in the recorded document." 17 U.S.C. § 205(c). A copyright registration certificate issued by and filed with the Copyright Office thus serves to put the world on constructive notice as to the ownership of the copyright and of the facts stated in the registration certificate. In this way, the Copyright Act's protections are analogous to the protections that federal law affords patents. *See Wise v. Hubbard,* 769 F.2d 1, 2 (1st Cir.1985) ("The United States Supreme Court has consistently held that the issuance of a patent and its recordation in the Patent Office constitutes notice to the world of its existence.") (citing *Sontag Chain Stores Co. Ltd. v. National Nut Co. of Cal.,* 310 U.S. 281, 295, 60 S.Ct. 961, 967–68, 84 L.Ed. 1204 (1940); *Wine Ry. Appliance Co. v. Enterprise Ry. Equip. Co.,* 297 U.S. 387, 393, 56 S.Ct. 528, 529, 80 L.Ed. 736 (1936); *Sessions v. Romadka,* 145 U.S. 29, 50, 12 S.Ct. 799, 805, 36 L.Ed. 609 (1892); *Boyden v. Burke,* 14 How. (55 U.S.) 575, 582, 14 L.Ed. 548 (1852)). On the undisputed facts of the case, therefore, Durkin had constructive notice of Saenger's claim of exclusive ownership of the copyrights in *Life* and *Property* as of November 1986, the effective date of registration for both works.

Third, it is undisputed that all of the manuals that Saenger published, including those at issue in this case, openly displayed a United States copyright notice that announced to the world that Saenger was the copyright owner. Inasmuch as Durkin concedes that he worked on and with these same materials during the period that he worked at Saenger (1986–1992), Durkin must be presumed to have had actual notice that Saenger had breached the terms of the alleged oral agreement more than six years before he filed his contract counterclaim in August 1994.

Durkin's argument that the discovery rule tolls the statutes of limitations on his state law counterclaims until April 1992, when he stumbled upon the "COPYRIGHT INFO." file at Saenger, is thus unavailing. Durkin was at best deliberately indifferent as to what was contained in the copyright applications when they were drafted in his presence and he was constructively, if not actually, on notice of Saenger's incompatible claim of exclusive copyright ownership. Saenger's alleged fraud, breach, and deceptive business practices were thus knowable to him in 1986 had he exercised minimal and reasonable diligence. By no stretch of the imagination were the facts of which Durkin complains "inherently unknowable" to him prior to April 1992. *Catrone,* 929 F.2d at 885; *Ely,* 668 N.E.2d at 804 n. 7; *Gore,* 461 N.E.2d at 259.

In view of these undisputed facts and the applicable legal standards, no reasonable juror could fail to find that Durkin knew or, through reasonable diligence, should have known of Saenger's claim of exclusive ownership of the copyright in *Life* and *Property* more than six years before he filed his counterclaim for breach of agreement, more than four years before he filed his chapter 93A action for deceptive and unfair business practices, and more than three years before he filed his cause of action alleging fraud. Therefore, Durkin's counterclaims were extinguished by the limitations period as a matter of law. *See Daboub v. Gibbons,* 42 F.3d 285, 291 (5th Cir.1995) (upholding grant of summary judgment on ground that state law causes of action, raised in context of copyright infringement case, were time-

 

barred given what and when the plaintiffs actually knew, or through reasonable diligence, should have known about allegedly wrongful conduct).

Durkin's fallback position is similarly unpersuasive. Specifically, Durkin argues that the statutes of limitations applicable to his counterclaims should be tolled pursuant to Mass. Gen. Laws ch. 260, § 12 because Saenger fraudulently concealed his alleged breach of agreement and deceptive business practices. We need not dwell on this argument. "Where a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action ... is equivalent to fraudulent concealment for purposes of applying § 12." *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 N.E.2d 159, 174 (1997). Here, however, as we have discussed, there was no partnership, and thus no fiduciary relationship, between Durkin and Saenger. In the absence of a fiduciary relationship, "'the estoppel provision of Mass. Gen. Laws Ann. ch. 260, § 12 is generally not available where the plaintiff is capable of discovering the facts allegedly concealed.'" *Wise*, 769 F.2d at 4 (quoting *Burbridge v. Board of Assessors*, 11 Mass.App.Ct. 546, 417 N.E.2d 477, 480 (1981)). As discussed above, Durkin was fully capable of discovering the facts that Saenger allegedly concealed from him through the expenditure of but minimal effort. Finally, nothing in the record suggests fraudulent concealment. Saenger secured valid copyright registrations and affixed copyright notices to the works in question, which Durkin worked on over a period of many years. As Saenger correctly argues: "Public notice is not concealment. Public display is not deception."

Our resolution of the statute of limitations issue obviates our need to consider the dispute between the parties regarding the statute of frauds. In short, the fact that Durkin's counterclaim for breach of contract was extinguished by the limitations period essentially moots the question of whether the April 1986 oral agreement could have been enforced despite the fact that it was never memorialized in a writing.

## Conclusion

The district court properly found that no genuine issue of material fact existed as to Saenger's ownership of valid copyrights and Durkin's infringement of them, and thus correctly concluded that Saenger was entitled to judgment in its favor as a matter of law. The district court also correctly determined that the applicable Massachusetts statutes of limitations bar Durkin's various state law counterclaims against Saenger. For the reasons discussed above, we therefore ascribe no error to the district court's rulings.

**Affirmed. Costs to appellee.**