**Nurjhan B. GOVAN, Plaintiff,**

v.

**TRUSTEES OF BOSTON UNIVERSITY, et al., Defendants.**

**No. Civ.A. 97–11056–PBS.**

United States District Court, D. Massachusetts.

May 26, 1999.

Nurjhan B. Govan, Macon, MI, pro se.

Lawrence S. Elswit, Office of the General Counsel, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

SARIS, District Judge.

*Pro Se* plaintiff Nurjhan B. Govan ("Govan"), an African–American woman, was terminated from the Ph.D. program in the Department of Psychology ("Department") at defendant[1] Boston University ("BU") after failing her qualifying examinations for the third time. More than six years after receiving her notice of termination, Govan filed this complaint on May 7, 1997, alleging that she was treated differently because of her race, in violation of 42 U.S.C. §§ 1981, 1985, 2000d and state law.[2] BU has moved for summary judgment. After hearing, the motion is *ALLOWED,* except with respect to the claim of breach of contract involving the terminal master's degree. That claim is dismissed without prejudice to refiling in state court.

### UNDISPUTED FACTS

With all reasonable inferences drawn in favor of the non-moving party, the facts (many of which defendants dispute) follow.[3] *See Barreto–Rivera v. Medina–Vargas,* 168 F.3d 42, 45 (1st Cir.1999).

1. *The Early Years*

Govan enrolled in the Personality Psychology Ph.D. program in BU's Depart-

---

1. The individual defendants are Dr. Dennis Berkey, provost of BU, and Dr. Joseph C. Speisman, professor.

2. The Amended Complaint asserts violation of 42 U.S.C. § 1981 (Count I); violation of the Massachusetts Civil Rights Act, Mass.Gen .L. ch. 12, § 11H (Count II); breach of contract (Count III); violation of the Equal Protection and Due Process clauses of the Fourteenth Amendment (Count IV); a conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985 (Count V); a violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d (Count VI); and intentional infliction of emotional distress (Count VII). The Second

Amended Complaint (which is eighty-seven pages long and reads like a brief) is unverified and unsigned. Because I did not allow plaintiff to file a second amended complaint, I will treat the First Amended Complaint as the operative document. The Court denied the motion to dismiss, except with respect to Count IV, and permitted a period of discovery.

3. Although the First Amended Complaint is unverified, Plaintiff submitted an affidavit stating that all statements in her fifty-four page memorandum in opposition to the motion for summary judgment are true.

ment of Psychology in 1980. She was the only African–American woman in the program. During her early years in the program, she experienced various academic difficulties. For example, she initially received a grade of "incomplete" in a personality theory course taught by Dr. Kathleen White; Professor White later gave her a "C" after she retook the course successfully with defendant Speisman. Ultimately, Govan fulfilled all her course and language requirements. Overall, her grade point average was 3.09.

During the 1982–1983 academic year, Govan took a leave of absence for a year to study as a clinical psychology intern at the Crownsville Hospital Center in Maryland. While there, she joined the United States Air Force Reserves. She accepted an active duty military commission and became a commissioned officer (Captain/Chaplin) in the Air Force, assigned to Offut AFB, Nebraska. In December 1984, she became a resident of Bellevue, Nebraska. Although the faculty warned her it would be difficult, Govan attempted to fulfill her academic requirements long distance.

2. *The Qualifying Exam*

Govan's donnybrook was the qualifying examination. Students interested in pursuing their doctorate must pass a qualifying exam, which is a comprehensive exam consisting of two portions, a take-home and a sit-down. Students must pass both portions prior to beginning work on their dissertations. The questions are drawn from a published list of possible test questions. The exam is blind-graded without knowledge of the student's identity, and evaluated by two faculty members. More may be asked to review the exam if there is disagreement about the grade to be awarded.

Govan flunked the qualifying examination three times. Govan's first attempt took place in October 1985. At this time she was still stationed in Nebraska as an Air Force chaplain. Although the take-home was sent to Govan in Nebraska, the

exam never reached her. Instead, Govan completed her take-home and sit-down examination in Boston after driving from Omaha to Boston. This snafu created a hardship for Govan. She packed her vehicle, with all the academic resources she could fit, and drove a distance of 1800 miles to pick up the test in her school mailbox. In a letter dated November 8, 1985, defendant Joseph Speisman, citing "incomplete" and irrelevant answers, informed Govan that she did not pass her exam. In fact, she received a failing grade on each of the questions in both portions of the examination. Four faculty members who blind-graded the paper concurred in this result.

To explain her failure, Govan claims that her access to sample responses to questions in the qualifying examination was hampered because they remained in "sign out" status throughout the study period; that she was treated differently from white students because the examination tested areas that differed from her domain of study; and that Speisman offered her faulty advice on how to study. She also states that she was fatigued by her drive, packed the wrong resources, and had to use an inadequate rental typewriter. She says she was denied the opportunity to enhance her test score by reworking her test responses.

Govan's second attempt began in the fall of 1986. In September, Henry Weinberg, Department Chair, wrote to Govan stating that she could take both portions of the examination at her base where she served as chaplain. After waiting in Nebraska for the pool of study questions, which Speisman stated might be revised, she lost three months of study time. She was attempting to update her resource material at Speisman's suggestion when the chairman insisted she sit for another qualifying examination. Stressed and unprepared, she sat for her exam on December 12, 1986. She was informed of her failing performance in both portions of the examination in a letter dated February 13, 1987.

On March 16, 1987, Speisman spoke with Govan, telling her that by failing her second qualifying examination, she was essentially disqualified from continuing toward the doctorate degree. He also stated that it was his judgment that she "was not educationally qualified to complete" the program. However, when she insisted on continuing, he told her that she first had to pass the language requirement and had to petition the faculty. In July, Govan wrote to Speisman reiterating her wish that the faculty take into consideration the hardships that she had encountered while attempting to continue her studies from Nebraska.

To demonstrate her willingness to continue, Govan returned to school in the Fall of 1988, and informed Speisman that she was being tutored in French in preparation for the language exam, which she passed on November 2, 1988.

Govan wrote to Speisman in February 1989 indicating her desire to finish the doctorate degree. She informed him that she had left the Air Force in order to dedicate more time to her studies. In response, on March 14, 1989, he wrote that while there was no precedent for a third attempt at the qualifying examinations, the faculty had decided to give her another chance because she was in the armed services and a distance from the university. She was given the option of taking her qualifying examination with the rest of the students in September 1989. Speisman warned Govan that should she fail, the faculty would recommend her termination from the program. In May 1989, Govan wrote to the Department's faculty and informed them that her schedule would not permit her to take the September examination. She also requested that she be allowed to "redo" rather than "retake" the exam. Her request was denied.

On August 20, 1989, Speisman informed Govan that she could take any regularly scheduled exam in the Fall or at any time during the academic year 1989–1990 provided that she give the faculty six weeks notice. He reiterated that this was her final opportunity to pass, and that a failure would necessitate her termination from the program.

On November 16, 1990, Govan received her third take home portion of her qualifying examinations in Nebraska. Govan claims that Speisman told her incorrectly that there would be no previous questions from the repeat examination, and therefore she did not study based on these questions. Contrary to what Speisman had allegedly said, two of the three questions were repeated. A month later, she was informed via telephone that she had failed and would be receiving written notification of this fact. On March 11, 1991, Govan received a notice of termination from Christopher T. Baldwin, Associate Dean of the Graduate School, which was retroactively effective September 1, 1990. The Department recommended withdrawal from the program. She requested, but never received, a scored copy of the qualifying examination.

### 3. *The Appeal*

On March 24, 1991, Govan wrote to William Mackavey ("Mackavey"), Department Chair, regarding her desire to appeal the decision to terminate because she believed she had experienced "differential treatment" and "questionable supervision." She hired an attorney. Two days later, attorney Kirk E. Brumbaugh wrote to Associate Dean Baldwin on Govan's behalf requesting reinstatement and a stay of further actions to terminate. On November 12, 1991, Govan again wrote to Chairman Mackavey requesting information about the academic appeals process. On November 21, 1991 Mackavey referred her to Baldwin. On January 27, 1992, she wrote to Mackavey to press her appeal.

In a letter dated February 21, 1992, Baldwin referred Govan to direct future correspondence regarding the academic appeals process to Dennis Berkey ("Berkey"), Dean of the Graduate School.

Baldwin also informed her that her case had already passed through "at least three levels of review" by the Department, the Graduate School Committee on Academic Standards and himself as an associate dean, and that a review of the documentation indicated that she was "unable to make appropriate progress" in the doctorate program. However, he acknowledged that she was "entitled" to an appeal process. In her response dated March 30, 1992, Govan stated that she was "shocked" that an appeals process could be exhausted before she even had a chance to participate. In a letter dated May 1, 1992, citing their numerous phone conversations and correspondence, Baldwin "categorically" denied that Govan had not had an opportunity to participate, stating that the procedures had been reviewed and "due process" verified. He concluded that his "final decision stands."

### 4. *The Master's Degree*

In June 1992, Govan wrote to Berkey requesting information on a M.A. degree, and informed him that she was in the process of preparing a transcript of her experiences in the Department. Berkey had still not received the transcript by February 1993. On February 1, 1993, Dennis D. Berkey, Dean of the College of Liberal Arts, wrote to Govan in reference to a phone conversation about the requirements to complete and receive a M.A. from the Department, and stated that Govan would have to file a program change request form and a letter indicating that she would not pursue further doctorate study at BU before the Graduate School could recommend that a "terminal" M.A. degree be granted by the faculty of the Psychology Department. While he stated that the recommendation would probably be acted upon "favorably," he added that he could not guarantee a degree because the granting of degrees was in the Department's discretion.

On February 23, 1993, Govan wrote to Berkey and thanked him for the informa-

tion about the M.A. degree. The letter also expressed her disappointment at Berkey's refusal to meet with her, and her desire not to pursue this matter further with him.

### 5. *Three Years Later*

More than three years passed. In a letter dated December 24, 1996, Govan requested readmission to finish her doctorate and copies of her old exams. On January 29, 1997, Jean Berko Gleason, acting Department Chair, replied to Govan, stating "copies of examinations are not available, and the department does not wish to consider readmission."

On February 10, 1997, Berkey, now provost, stated that Govan had been "provided with an unusually exhaustive series of appeals" leading to the "unavoidable conclusion" that she had failed to meet the academic standards for the doctorate program. Accordingly, he refused to grant her request of re-admission to the program. On March 10, 1997, Govan submitted a brief to Berkey containing her account of mitigating factors. In a letter dated April 7, 1997, Berkey treated the letter as an "appeal" of his previous refusal to direct her re-admittance to the Ph.D. program. He refused to reverse his previous decisions and reminded her that this was a final decision that could not be appealed.

Govan's administrative status was changed from "withdrawn" to "dismissal." Apparently, this change in status has significant consequences because withdrawal status provides the option for a student to return to the university. A dismissal precludes such options. On May 7, 1997, Govan filed a complaint against BU.

### DISCUSSION

### 1. *Summary Judgment Standard*

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36–37 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position.)" *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### 2. Timeliness

■ Plaintiff asserts federal claims under 42 U.S.C. §§ 1981,[4] 1985 [5], and 2000d.[6] All three claims are governed by the Massachusetts three-year statute of limitations for personal injury claims. *See* Mass. Gen.L. ch. 260, § 2A (West 1999); *see also Johnson v. Rodriguez*, 943 F.2d 104, 107 (1st Cir.1991) (setting three year statute of limitations for § 1981 claims); *McDougal v. County Imperial*, 942 F.2d 668, 673 (9th Cir.1991) (applying state personal injury statute of limitations to § 1985 claims); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 79 (3d Cir.1989) (same); *Baker v. Board of Regents*, 991 F.2d 628, 631 (10th Cir.1993) (holding that state's personal injury statute of limitations also applies to a § 2000d claim); *Ivani Contracting v. City of New York*, 103 F.3d 257, 260 (2nd Cir. 1997) (applying state statute of limitations to §§ 1981, 1983 and 2000d), *cert. denied*, 520 U.S. 1211, 117 S.Ct. 1695, 137 L.Ed.2d 821(1997); *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir.1996) (applying state personal injury state of limitations to §§ 1983, 1985 and 2000d); *Egerdahl v. Hibbing Community College*, 72 F.3d 615, 618 (8th Cir.1995) (applying personal injury state of limitations to § 2000d).

■ While statutes of limitation are determined by state law, the question of when civil rights causes of action accrue is a matter of federal law. *See Street v. Vose*, 936 F.2d 38, 40 (1st Cir.1991). The accrual period in a federal civil rights case begins when the plaintiff knows or has reason to know of the injury on which the action is based. The statute of limitations begins to run when the plaintiff knows of the injury or "when facts supportive of a civil rights action are or should be apparent to a reasonably prudent person similarly situated." *Rodriguez Narvaez v. Nazario*, 895 F.2d 38, 41 n. 5 (1st Cir.1990);

---

**4.** Section 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981 (1997).

**5.** Govan brings this claim under 42 U.S.C. § 1985(3), governing conspiracies to interfere with civil rights, stating that where someone "is injured in his person or property, or deprived of having and exercising any rights or privileges of a citizen of the United States, the party so injured may have an action ... against any one or more of the conspirators."

**6.** Title VI of the Civil Rights Acts of 1964, codified as 42 U.S.C. § 2000d, provides that no one on the grounds of "race, color or national origin, be excluded participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

*see also Piacentini v. Levangie,* 998 F.Supp. 86, 88 (D.Mass.1998).

■ Similarly, the Massachusetts Civil Rights Act is governed by a three-year statute of limitations for civil rights claims. *See* Mass.Gen.L. c. 260, § 5B (West 1999). Claims for intentional infliction of emotional distress are governed by the three year personal injury statute of limitations. *See* Mass.Gen.L. c. 260, § 2A (West 1999); *Pagliuca v. City of Boston,* 35 Mass.App.Ct. 820, 822–23, 626 N.E.2d 625, 627–28 (1994). As with their federal counterparts, both causes of action accrue when plaintiff knew or should have known of her injury. *See Riley v. Presnell,* 409 Mass. 239, 243, 565 N.E.2d 780, 784 (1991); *Messere v. Murphy,* 32 Mass.App.Ct. 917, 918, 585 N.E.2d 350 (1992).

■ The key question, then, is when Govan knew, or had reason to know, that she had been injured by defendant. *See Johnson v. General Electric,* 840 F.2d 132, 135 n. 1 (1st Cir.1988) (cause of action accrues when there was no "foreseeable event other than appeal that would affect or change the discriminatory impact"). She complains that she was "tracked for failure;" that the administration of the qualifying examination was "unstandardized" because the faculty gave "different and erroneous testing instructions and misleading study guidelines;" that the qualifying examination was inconsistent with her "domain of study;" that she received inadequate supervision, financial aid, and mentoring compared to white counterparts; that she was deprived of the preferential method of choice by students in [her] program for enhancing less than satisfactory qualifying examination performance—"reworking the exam;" that Speisman consistently interfered with her exam preparation; that she was given inadequate grievance procedures because she did not get a copy of her last failed qualifying exam or a hearing; and that she was improperly denied her masters degree because she refused to sign an agreement stating she would not seek to complete her doctoral studies at BU.

As evidence of racial discrimination, she claims that a white student, whom Speisman disliked, was not subject to the same harsh treatment; that, from 1980–1990, not one racial minority completed the personality psychology program; and that another racial minority student was eliminated because of the qualifying examination.

Regardless of the merits of this litany of grievances, Govan knew or had reason to know of all these discriminatory treatment claims by May 1, 1992, when her appeal of the termination from the program was unsuccessful. Indeed, Govan wrote a year earlier, on March 24, 1991, to Mackavey stating her intention to appeal her failing marks on the qualifying examination citing "irregularities in the administration" of the exam and also differential treatment by the faculty. She even hired a lawyer. Based on the claims asserted by Govan, the Court concludes the facts supportive of Govan's civil rights action would have been apparent to a reasonably prudent person by mid–1992 at the latest.

■ Plaintiff argues that defendants are estopped from asserting the statute of limitations because defendant Speisman withheld information regarding the university appeal and grievance procedures, and a scored copy of her most recent qualifying examination. *See Benitez–Pons v. Commonwealth of Puerto Rico,* 136 F.3d 54, 63–64 (1st Cir.1998) (discussing federal equitable estoppel principles in the context of a § 1983 action). However, she was aware of these alleged misdeeds at least by 1992. Alternatively, she argues that she was intimidated and "paralyzed" by the school's demand that she forego her right to pursue her doctorate in order to be considered for an award of a master's degree. She said she was debilitated by a "veiled threat" that the faculty had the discretion not to grant the master's degree. However, this "veiled threat" was made in 1993. There is nothing in the record that supports a claim of estoppel or duress suffi-

cient to toll the statute of limitations for another four years.[7] Accordingly, all these claims in Counts I, II, V and VI are time-barred.

### 3. Breach of Contact Claim

A six year statute of limitation applies in Massachusetts for breach of contract actions. *See* M.G.L. c. 260, § 2 (West 1999). An action for breach of contract "accrues at the time of breach, thereby triggering the statute of limitations for purposes of determining whether a claim is time-barred." *Saenger Organization, Inc. v. Nationwide Ins. Licensing Associates, Inc.*, 119 F.3d 55, 64 (1st Cir.1997). Accrual begins when the plaintiff knows or should have known the cause of action. *See id.*

BU argues that Govan's claim of breach of contract accrued when she was notified of her termination in March 1991. However, she learned her appeal had failed on May 1, 1992. Because the university acknowledges that Govan had the contractual right to appeal the decision to terminate, the contractual cause of action accrued on the later date and the claim is timely.[8]

A successful claim for breach of contract requires that Govan demonstrate: (1) the existence of a valid and binding contract with regard to her doctorate degree; (2) that BU breached its duties with respect to this aspect of Govan's contract; and (3) that she suffered damages from the breach. *See Guckenberger v. Boston University*, 957 F.Supp. 306, 316 (D.Mass. 1997). To survive BU's motion for summary judgment, Govan must "put forth competent evidence on each of these issues." *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1122 (1st Cir.1995).

A student-university relationship is essentially a contractual one. *See Russell v. Salve Regina College*, 890 F.2d 484, 488 (1st Cir.1989), *rev'd on other grounds*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), *reinstated on remand*, 938 F.2d 315, 316 (1st Cir.1991); *Guckenberger*, 957 F.Supp. at 317. However, there is need for caution in entering into the area of the student-college relationship. *See Russell*, 890 F.2d at 489. Courts rely on "catalogs, manuals, handbooks, etc." to assist in the determination of the terms of contract with an academic institution. *Id.* at 488.

Govan raises four separate claims of breach of contract. First, she alleges that BU breached its contract when school officials failed "to enforce policies protecting students from unfair practices and discrimination." Govan states that white students were treated differently from her in that they were supported in their academic pursuits via "pep talks" and "proper supervision." As proof of differential treatment, she mentions an Asian student who dropped out because of alleged conflicts with Professor White. Govan says that his critique of White was "academic suicide." Govan also tries to differentiate the students by discussing a white student who had "similar strained relations with Joseph Speisman but who was not similarly treated and that the determinate factor in the difference in the way [they] were treated paralleled the difference in race." The problem with the differential treatment breach of contract claim is that there is insufficient evidence that other similarly situated white students were treated differently with respect to supervision, teaching, test taking or test-grading. Her biggest beef seems to be that other students were allowed to

---

7. Plaintiff's reliance on the Administrative Procedures Act is misplaced because it is applicable only to federal agencies. *See* 5 U.S.C. § 551(1).

8. Actually, the record is somewhat unclear on this point. Dean Baldwin told her she was "entitled" to an appeal process on February

1, 1992 by writing to Dean Berkey. Govan appeared to abandon her appeal at that point in time and wrote to Berkey primarily about receiving her master's degree. In any event, after the correspondence with Berkey in 1993 about the master's degree, there was a hiatus of three years.

rework answers to questions while she had to retake the whole examination. However, without more, disparate treatment or even "garden variety" unfairness does not support a claim of racial discrimination. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 53 (1st Cir.1990).

■ Second, she alleges that BU forced her to sit unprepared for the second examination. However, unlike any other student, plaintiff was allowed to take the qualifying exam *three* times. With respect to the last examination, she was permitted to take the exam at any regularly scheduled time, as long as six weeks advance notice was given. She still failed.

■ Third, there is no evidence that BU breached any of its grievance or appeal policies. Specifically, she complains bitterly that she was given no hearing. However, she points to no policy, manual or handbook that gives her the right to such a hearing.

■ Fourth, Govan claims that BU violated her contract by refusing to give her a terminal master's degree although she had met all the course requirements simply because she refused to write a letter stating she would not pursue her doctorate in 1997. The letter from Dean Berkey suggests that she did successfully complete the academic requirements to obtain a M.A., and the only remaining step was faculty approval. This claim of breach of contract is timely and cannot be resolved on this record.

### ORDER

BU's motion for summary judgment (Docket 32) is *ALLOWED* except with respect to the breach of contract claim involving the alleged improper refusal to give Govan her terminal master's degree. That claim is dismissed without prejudice to refiling in state court.