**Paul F. YOUNG, Matteo J. Panarelli, and United Steel Workers of America, AFL–CIO, Plaintiffs,**

v.

**IMO INDUSTRIES, INC., Defendant.**

**Civil Action No. 94–12508–MBB.**

United States District Court,
D. Massachusetts.

March 31, 2008.

Lisa Bazemore, Joseph J. Costello, Jeffrey E. Fleming, Timothy P. O'Reilly, Amy L. Ventry, Morgan, Lewis & Bockius, Philadelphia, PA, Evan Miller, Jones Day, Washington, DC, Maureen Mulligan, Ruberto, Isreal & Weiner, Boston, MA, for Defendant.

Maydad D. Cohen, Betsy L. Ehrenberg, Warren H. Pyle, Pyle, Rome Lichten, Ehrenberg & Liss–Riordan, P.C., Boston, MA, for Plaintiffs.

### MEMORANDUM AND ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 124); DEFENDANT IMO INDUSTRIES, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 126)

BOWLER, United States Magistrate Judge.

Pending before this court is a motion for summary judgment filed by plaintiffs Paul F. Young ("Young"), Matteo J. Panarelli ("Panarelli") and United Steelworkers of America, AFL–CIO ("the union") (collectively: "plaintiffs") and a motion for summary judgment filed by defendant Imo Industries, Inc. ("Imo"). After conducting a hearing on October 17, 2007, this court took the summary judgment motions (Docket Entry # # 124 & 126) under advisement.

### STANDARD OF REVIEW

The standard of review of a summary judgment motion is well established. Summary judgment is appropriate " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Poulis–Minott v. Smith,* 388 F.3d 354, 362 (1st Cir.2004) (quoting Rule 56, Fed.R.Civ.P.).

"A genuine issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party." *Putnam v. Town of Saugus,* 365 F.Supp.2d 151, 165 (D.Mass.2005) (internal quotation marks omitted); *accord Velez–Rivera v. Agosto–Alicea,* 437 F.3d 145, 150 (1st Cir.2006) (genuine means " 'evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party' "). A fact is material when "it is one that might affect the outcome of the suit under governing law." *Velez–Rivera v. Agosto–Alicea,* 437 F.3d at 150. Facts are viewed in the light most favorable to the nonmoving party with disputes resolved in favor of the nonmoving party. *Merchants Ins. Co. v. United States Fid. & Guar. Co.,* 143 F.3d 5, 7 (1st Cir.1998); *see Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc.,* 119 F.3d 55, 56 (1st Cir.1997). Each summary judgment motion is reviewed separately and factual disputes are resolved in favor of the nonmoving party. *See Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates,* 119 F.3d 55, 56 (1st Cir.1997).

## BACKGROUND[1]

On June 20, 1990, Boston Gear Works ("Boston Gear"), a division of Imo, entered into a Plant Closing Agreement ("PCA") with the union regarding the closing of the Boston Gear plant in Quincy, Massachusetts. (Docket Entry # 129). On December 16, 1994, plaintiffs initiated suit by filing a class action complaint alleging that Imo breached the terms of a 1989 Collective Bargaining Agreement ("CBA") between the union and Boston Gear under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. The complaint also includes an estoppel claim and a claim alleging that Imo's unilateral change in retiree medical coverage violated section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

After entering into a stipulation and agreement to settle and dismiss the claims ("the settlement agreement"), the district judge entered an order approving the settlement on April 2, 1999. On June 15, 2005, however, plaintiffs filed a motion for an order directing compliance with the settlement agreement and a final judgment ("motion for an order for compliance") alleging that Imo breached the settlement agreement. The parties jointly agreed to limit the current allegations that Imo breached the settlement agreement to eight claims set forth in a joint proposed discovery plan. (Docket Entry # 112).

After filing the initial compliant, the district judge conditionally certified the following class on August 16, 1995:

All persons formerly employed as production and maintenance employees by the defendant Imo Industries and its predecessors at the Boston Gear Works plant in Quincy, Massachusetts, who are now retired with a pension, and their spouses and eligible dependents of deceased persons formerly employed as production and maintenance employees by Imo Industries and its predecessors at its plant in Quincy, Massachusetts who retired with a pension.

(Docket Entry # 22). By definition, the class therefore included only Boston Gear employees already retired including those age 65 and older and potentially those under the age of 65.[2]

---

1. Citations to the record are provided primarily only for direct quotations. Exhibit numbers for plaintiffs' summary judgment refer to numbers provided in the courtesy copy documents which may differ from the exhibit numbers on the electronic docket. Additional facts are set out in the discussion section.

2. As discussed *infra,* the company's pension plan allowed employees to retire before age 65 under certain circumstances.

On June 8, 1998, the district judge issued a ruling denying a summary judgment motion filed by Imo. Noting that the PCA incorporates the language of the CBA concerning retiree medical benefits [3] and that the PCA's applicability clause applies to employees listed in appendix A,[4] the district judge determined that the PCA "on its face applies only to active employees listed in the Plant Closing Agreement Appendix." (Docket Entry # 66). Notably, the district judge found no ambiguity in the PCA. By "its terms" and "on its face," the PCA "applies only to active employees listed in" appendix A.[5] (Docket Entry # 66).

Appendix A, which lists the active employees working as of May 16, 1990, includes a number of Boston Gear employees who had not retired as of May 16, 1990, as well as those who were not yet eligible to retire. (Docket Entry # 129, ¶ I; Docket Entry # 125, ¶ 66).[6] When a number of these employees retired from Imo, the company did not notify them of any right to receive medical coverage.[7] For example, Ralph Fabrizio is listed in appendix A and was an active employee in May 1990. He retired and began receiving a pension

**3.** Under the section applicable to "Retiree Life and Medical Insurance," the PCA states that, "retiree life and medical insurances will be provided in accordance with the provisions of the 1989 Collective Bargaining Agreement." (Docket Entry # 129). In the summary judgment opinion, the district judge explained that, "The 1989 CBA repeated the standard retiree health care language to the effect that the Company would pay in full for medical coverage for all employees with at least twenty years of service." (Docket Entry # 66, p. 11).

**4.** The applicability clause, similar to the language in the seventh whereas paragraph of the settlement agreement, reads as follows:

I. *Applicability*
The provisions of this Agreement shall apply to Bargaining Unit employees on the active payroll and working as of May 16, 1990. A listing of such employees appears in Appendix A attached.
(Docket Entry # 129).

**5.** The district judge additionally noted that the PCA "vests this group of employees and their spouses or widows with, in effect, a continuing right to medical coverage at [Imo] expense after the employee retires." (Docket Entry # 66). Notably, the fact section of the opinion sets out in detail the provisions of the 1989 CBA which provided " 'medical coverage at [Imo] expense to the retiree and his spouse ... provided the person was listed on the Retiree roster dated October 11, 1977, and for any employee who retires after September 1, 1997.' " (Docket Entry # 66).

Pointing out that the CBA only provides medical coverage to employees listed on "the retiree roster dated October 11, 1977," Imo argues that the employees listed in appendix A are not entitled to medical coverage under the settlement agreement. As discussed infra, however, the plain language of the settlement agreement, like the similarly plain language of the PCA interpreted by the district judge, provides medical coverage to all employees listed in appendix A.

**6.** Imo did not controvert with "page references to affidavits, depositions or other documentation," LR. 56.1, the statement in plaintiffs' statement of undisputed material facts (Docket Entry # 125, ¶ 66) that individuals listed in appendix A include 44 individuals who had not retired and were not then eligible to collect a pension as deferred vested employees under the pension plan. *See* LR. 56.1; *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 12 (1st Cir.2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); *Stonkus v. City of Brockton School Department*, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted the undisputed material facts that the plaintiff failed to controvert).

**7.** Young testified that there were 44 employees on appendix A who had not yet retired from Imo and who were not then eligible for retirement. (Docket Entry # 125, Ex. 1). Imo alleges that the number is 45. (Docket Entry # 139, p. 12).

in September 2000. Imo did not, however, notify him at the time he retired about the ability to receive retiree medical benefits.

The PCA also provided pension benefits "in accordance with the provisions of [the CBA]" to all "employees listed on the active payroll and working as of May 16, 1990." (Docket Entry # 129). The PCA stated unequivocally that these employees "shall be vested." (Docket Entry # 129).

At the time of the PCA and prior to the settlement, the company's pension plan defined normal retirement age as age 65 or as age 60 with five years of participation in the plan. The pension plan distinguished between employees eligible to receive a retirement and those eligible for a "deferred vested pension." (Docket Entry # 131). Deferred vested pensions allowed a pension if the participant was not eligible to receive a retirement under the other provisions of the plan and had a break in service as well as five years of credited service. (Docket Entry # 131). Other categories of retirement allowed an employee to retire immediately at various ages, including ages under 65 (Docket Entry # 132, ¶¶ 4.3 & 4.5) depending upon the number of years of credited service.

The CBA also provided lifetime medical coverage to retired employees and their spouses and widows.[8] The Imo retiree medical plan enrollment guide ("the medical enrollment guide" or "the enrollment guide") clarified that the company provided medical coverage only if the employee "received an *immediate* pension from the company and [was] participating in an Imo-sponsored medical plan on [his] last day as an active employee." (Docket Entry # 125, Ex. 4, emphasis added).[9]

The medical enrollment guide divided employees into two groups, those "under age 65" and those "age 65 or older," offering different plans to the two groups. (Docket Entry # 125, Ex. 4). Members in the age 65 and older group could choose from the Retiree Basic Plan or the Retiree Premium Plan. Members in the under age 65 group could choose a comprehensive medical plan. Both groups could also choose health maintenance organization ("HMO") "coverage, if available." (Docket Entry # 125, Ex. 4).

After the district judge issued the summary judgment ruling and with a looming trial date of August 12, 1998, the parties entered into negotiations that led to the settlement agreement. During negotiations, Imo's counsel[10] proposed expanding the class conditionally certified by the court "to include those employees who are covered by the [PCA] but who had not yet retired at the time the class was certified. These individuals arguably are entitled to some form of medical coverage upon retirement and should therefore be included in the settlement." (Docket Entry # 132, Ex. E). Imo's counsel also suggested amending the class definition to exclude dependents other than spouses. He additionally insisted that class members "retain the right to substitute substantially similar coverage from other carriers." (Docket Entry # 132, Ex. E).

In a letter dated August 31, 1994, Imo's counsel outlined the "terms of the settle-

---

8. See fn. five.

9. The enrollment guide provided by plaintiffs is "effective January 1, 1997." This court assumes, absent evidence to the contrary filed within five days of the date of this opinion, that the enrollment guide accurately states the medical coverage in effect prior to the settlement.

10. For ease of reference, "Imo's counsel" at times refers to Thomas M. O'Brien, described as Vice President of the Law Department and later as Senior Vice President and General Counsel, and at other times refers to Imo's outside counsel.

ment." (Docket Entry # 132, Ex. F). He cautioned, however, that the terms must be approved by the class members and "will have to be memorialized in a formal settlement agreement" and submitted to the court for final approval. (Docket Entry # 132, Ex. F). A September 1, 1997 letter confirms that "plaintiffs have reached a tentative settlement." (Docket Entry # 132, Ex. F).

The parties filed the settlement agreement on December 3, 1998 (Docket Entry # 75) and the court approved the agreement on April 2, 1999. Captioned "Stipulation and Agreement of Settlement and Dismissal of All Claims," the agreement begins with several "whereas" paragraphs. The first whereas paragraph, relied upon by Imo as a means to create an ambiguity that the settlement extends only to retirees as opposed to all individuals listed in appendix A to the PCA, reads as follows: "WHEREAS, [Imo] has provided certain medical benefits to eligible retired employees and their spouses (collectively, 'Retirees') pursuant to the terms of several collective bargaining agreements negotiated with [the union]." (Docket Entry # 125, Ex. 6).

The sixth whereas paragraph notes that the court previously and conditionally certified the class. It reads as follows:

WHEREAS, on August 16, 1994, the Court issued an Order .... certifying the following class ("Class"):

All persons formerly employed as production and maintenance employees by the defendant Imo Industries and its predecessors at the Boston Gear Works plant in Quincy, Massachusetts, who are now retired with a pension, and their spouses and eligible dependents of deceased persons formerly employed as production and maintenance employees by Imo Industries and its predecessors at its plant in Quincy, Massachusetts who retired with a pension.

(Docket Entry # 125, Ex. 6). As previously indicated, this conditionally certified class thus included only Boston Gear employees who were retired or deceased Boston Gear employees who had retired together with their spouses and dependents.

The next whereas paragraph states that: WHEREAS, Plaintiffs and Imo have stipulated to the modification of the Class to (1) exclude dependents ..., and (2) include additional individuals not encompassed within the original Class definition who were on Imo's payroll and working as of May 16, 1990 and *listed in Appendix A* to the Plant Closing Agreement negotiated between Imo and the Union.

(Docket Entry # 125, Ex. 6) (emphasis added). Accordingly, having excluded dependents, the document defined "Class" as both: (1) the conditionally certified class which included only retired Boston Gear employees and their spouses; *and* (2) the individuals listed in appendix A to the PCA. In light of the terms of the Imo pension plan, both of these groups could encompass individuals under and over the age of 65. The settlement agreement thereby modified the conditionally certified class to exclude dependents and to "include additional individuals not encompassed within the original Class definition who were on [Imo's] active payroll and working as of May 16, 1990 and listed on Appendix A to the [PCA]." (Docket Entry # 125, Ex. 6).

After the whereas paragraphs, the settlement agreement contains a section captioned "Final Order" followed by a section captioned "Terms of Settlement." The latter section depicts the crux of the agreement. In pertinent part, it reads as follows:

5. In full, complete and final settlement of all claims asserted in the Civil Action and subject to the satisfaction of all of

the terms and conditions of this Stipulation and Agreement, the parties shall comply with the following provisions:

a. *Lifetime Benefits and Right to Substitute Substantially Similar Coverage.* Subject to the premium and cost sharing provisions set forth in paragraph 5b herein, *Imo shall provide to all Class members lifetime medical coverage under the current medical plan options offered to Retirees. Imo shall have the right to substitute substantially similar coverage* from the same or other carriers. No changes in coverage options or cost sharing will take place during the remainder of 1998.

b. *Premiums and Cost Sharing.*

• *Retirees and spouses who are Medicare eligible (age 65 and over) and covered by the Plant Closing Agreement:* Effective January 1, 1999 and continuing thereafter, Imo will pay the full premium for the current standard HMO option for the retiree (and his/her spouse or surviving spouse, if applicable). Retirees can choose other available medical plan options offered by Imo, but must pay the additional premium costs, if any, for that option.

• *Retirees and spouses who are Medicare eligible (age 65 and over) and not covered by the Plant Closing Agreement:* Imo currently pays $59 per month for the premium for the current standard HMO option for individual retirees or surviving spouses, and $117.80 per month for the premium for the current standard HMO option for a retiree and spouse. Effective January 1, 1999, Imo will continue to pay these premium amounts; however, any increases in these premiums will be shared equally by Imo and the retiree and/or spouse. For example, should the 1999 premium for the current standard HMO option increase to $69 per month for an individual retiree, Imo will contribute $64 per month and the retiree or spouse will

contribute $5 per month for the premium. Retirees or surviving spouses can choose other available medical plan options offered by Imo, but must pay the additional premium costs beyond what Imo is paying for the HMO.

• *Retirees who are not Medicare Eligible (under age 65):* Effective January 1, 1999 Imo will pay the full premium for the current standard HMO option for the retiree (and his/her spouse or surviving spouse, if applicable). Imo will bear the increases in the current standard HMO premium in 2000, 2001, 2002 and 2003. The current standard HMO premium paid by Imo in 2003 shall become a permanent premium cap, and any premium increases beginning January 1, 2004 or thereafter shall be borne by the retiree (and his or her spouse, if applicable). Once retirees or spouses who are under age 65 become eligible for Medicare, they will be permitted to participate in the options available to Medicare-eligible retirees described above, depending upon whether covered or not covered by the Plant Closing Agreement.

(Docket Entry # 125, Ex. 6) (italics added).

To summarize, subparagraph (a) sets out the obligation that Imo "shall provide to all Class members lifetime medical coverage." Subparagraph (b) then sets out the medical plans and additional costs differentiated into three groups depending upon the class member's age and coverage under the PCA.

The settlement agreement required Imo to send out notice of the proposed settlement "to each member of the Class." (Docket Entry # 125, Ex. 6). Imo, however, only sent the notice to current retirees. The company did not send the class notice

to the approximately 44 non-retired employees listed in appendix A.[11]

In a section captioned "Release" appearing after the "Terms of Settlement" section, paragraph nine of the settlement agreement establishes procedures for resolving disputes. It states that disputes "shall be resolved exclusively and mandatorily" in the manner set out in the paragraph. (Docket Entry # 125, Ex. 6). Subparagraph 9(a) requires the party asserting the violation to "serve written notice to Class Counsel" no later than 90 days "after the circumstances giving rise to the claim ... have occurred." (Docket Entry # 125, Ex. 6, ¶ 9(a)). "Class Counsel and counsel for Imo" shall then discuss the matter and attempt to reach an agreed resolution within 60 days. (Docket Entry # 125, Ex. 6, ¶ 9(b)). If no resolution is reached, "the matter shall within sixty (60) days be submitted to the Court." (Docket Entry # 125, Ex. 6, ¶ 9(c)).

The time periods specified in paragraph nine "may be extended by agreement of the parties or by the Court for good cause shown." (Docket Entry # 125, Ex. 6, ¶ 9(e)). Immediately following this sentence, subparagraph 9(e) reads that:

> This paragraph nine shall not be construed to limit or shorten any statute of limitations applicable to disputes concerning written agreements, including this Stipulation and Agreement or the Court's Final Order, or to impair the right, if any, of any party to seek recovery of attorneys' fees and expenses incurred in connection with a dispute or claim.

(Docket Entry # 125, Ex. 6).

### I. Changes Made to Under Age 65 Health Plan

As noted above in subparagraph 5(a), the settlement agreement required Imo to offer class members coverage substantially similar to the current coverage under an HMO. The HMO in effect at the time of the settlement agreement and offered to participants under age 65 was the Aetna U.S. Healthcare Patriot Plan ("the Aetna Plan"). In November 1999, Imo sent a notice to all retirees under age 65 notifying them that it was discontinuing the Aetna Plan and replacing it with the Trigon Keycare 10 Plus Plan ("the Trigon Plan"). (Docket Entry # 125, Ex. 8).

During January 2000, the Trigon Plan went into effect with certain higher co-pays and deductibles. For example, the Trigon Plan charged higher co-pays for third tier prescription drugs. It also increased co-pays for office visits to specialists. (Docket Entry # 132, Ex. I; Docket Entry # 125, Ex. 8 & 9; Docket Entry # 133, Ex. K). Unlike the Aetna Plan, however, the Trigon Plan allowed participants to seek care for a specialist without obtaining prior approval from a primary care provider.[12]

---

**11.** Young testified that he reviewed the list of retired employees, the postage for the mailing and the number of employees on appendix A. Young also spoke with three or four non-retired employees who advised Young that they did not receive the class notice and/or could not remember receiving such a notice. Citing the failure to provide notice to these individuals, Imo argues that Imo never agreed to provide retiree coverage to these individuals. Imo offers additional evidence extrinsic to the settlement agreement to show that the parties intended only to provide retir-

ees who qualified for a retirement form of pension, as opposed to a deferred vested pension, with medical coverage.

**12.** Imo seeks summary judgment that the Trigon Plan provided substantially similar coverage to the Aetna Plan. Examining the above and the additional differences between the plans, this court finds a genuine issue of material fact as to whether the coverages are substantially similar within the meaning of subparagraph 5(a) of the settlement agreement.

On January 18, 2000, plaintiffs' counsel advised Imo's counsel that the increased co-pays and annual deductibles associated with the Trigon Plan violated the settlement agreement. (Docket Entry # 125, Ex. 12). In response, on March 14, 2000, Imo agreed to implement changes to the Trigon Plan so that it would "substantially match" the Aetna Plan. (Docket Entry # 125, Ex. 13).

In a follow up letter dated April 7, 2000, Imo's counsel advised plaintiffs' counsel that "unless [he] heard from [him] to the contrary," he would arrange to implement the changes detailed in the March 14, 2000 letter "effective May 14, 2000." (Docket Entry # 125, Ex. 14). By letter dated April 11, 2000, plaintiffs' counsel requested that the changes take effect "retroactive to January 1." [13] (Docket Entry # 125, Ex. 15). Imo's counsel replied in a May 5, 2000 letter advising that, "Retroactive to January 1, 2000, Trigon would be able to offer a 90–day supply of medication at select retail pharmacies." (Docket Entry # 125, Ex. 16). The letter was silent with respect to the retroactivity of the changes outlined in the March 14, 2000 letter.

Having heard a complaint from Young,[14] plaintiffs' counsel wrote to Imo's counsel in March 2001, inquiring about the status of the changes resulting from the prior year's correspondence and the action taken to implement those changes. By letter dated September 6, 2001, the Imo retiree service center informed all Boston Gear union retirees that the changes made to the Trigon Plan to more closely match the Aetna Plan took effect on April 1, 2001. Plaintiffs concede that the changes effective April 1, 2001, reverted the co-pays and deductibles to those existing in 1999 but seek reimbursement for the increased costs incurred from January 1, 2000, to April 1, 2001.[15] (Docket Entry # 125, p. 8).

Young received the notice from the Imo retiree service. He did not report the notice to plaintiffs' counsel even though he knew it was inconsistent with the settlement agreement.[16] (Docket Entry # 125, Ex. 2, pp. 61–65). Young was also aware there was a process under the settlement agreement to raise disputes. Incorrectly assuming or concluding that plaintiffs' counsel had agreed to make the changes retroactive only to April 1, 2001, as opposed to January 1, 2000, Young did not bring the issue to the attention of plaintiffs' counsel until 2003, at the earliest.[17]

13. The letter also asked that "the 90 day prescriptions should continue to be available at the drug stores." (Docket Entry # 125, Ex. 15).

14. Because Young believed that plaintiffs' counsel and Imo had agreed to make the changes retroactive only to April 1, 2001, he did not immediately contact plaintiffs' counsel about the changes. (Docket Entry # 125, Ex. 2).

15. Imo argues that the time constraints in paragraph nine of the settlement agreement bar this claim seeking retroactive reimbursement because plaintiffs waited until the June 2005 filing of the motion for an order for compliance to assert the claim.

The parties also dispute whether there was an agreement to make the changes retroactive to January 1, 2000, or to April 1, 2001. The record is disputed as to whether the parties agreed to make the changes retroactive to January 1, 2000, or retroactive to April 1, 2001. In other words, a genuine issue of fact exists as to the existence of any such agreement.

16. Young also did not ask for permission from the international union to be represented by counsel after he learned in September 2001 about the April 1, 2001 effective date of the changes.

17. Young testified that he spoke with "Betsy" in "2003, 2004." This court assumes that "Betsy" refers to Betsy L. Ehrenberg, Esq., an attorney in the office of plaintiffs' counsel. As admitted by plaintiffs in the undisputed statement of material facts, see fn. 35, it was in 2003 that "Young followed up with Plaintiff's counsel on another issue related to Defendant's obligations under the Settlement

As a final matter with respect to the under 65 plans, the Aetna Plan provided coverage for vision care services. Beginning in January 2004, however, the Trigon Plan did not provide a network for vision care.[18]

## II. *Changes Made to age 65 and Over HMO Plan*

In 2000, Secure Horizons Tufts Health Plan for Seniors ("Secure Horizons") provided the benchmark HMO coverage for class members in the age 65 and older group. From 2000 to 2005, Secure Horizons continued to provide the HMO coverage. Changing its name to the Tufts Health Plan Medicare Preferred HMO in 2006, it continued to provide the HMO coverage.

Between 2000 to 2007, however, co-pays and deductibles increased. For example, under the 2000 Secure Horizons Plan, a class member paid no deductible for an inpatient hospital visit to a hospital within the primary care physician's network. In 2003, however, the Secure Horizons Plan imposed a $125 calendar year deductible on the first inpatient hospital visit. The deductible increased to $200 in 2004. (Docket Entry # 125, Ex. 29, 32 & 33). Emergency room visit co-pays increased from $20 under the 2000 Secure Horizons

Plan to $35 in the 2002 Secure Horizons Plan. (Docket Entry # 125, Ex. 29 & 31). Whereas the 2000 Secure Horizons Plan charged co-pays of $10, $15 and $30 for one, two and three tier prescription drugs, the 2004 Secure Horizons Plan charged $15, $25 and $50 for one, two and three tier prescription drugs.[19]

Imo also charged premiums to seven former Imo employees who were listed in appendix A even though these individuals were eligible for Medicare and enrolled in one or more of the Secure Horizons plans. (Docket Entry # 125, ¶¶ 43–49).[20] As noted above, the settlement agreement for "Medicare eligible" employees covered by the PCA requires Imo to "pay the full premium for the current standard HMO option for the retiree." (Docket Entry # 125, Ex. 6). In a January 9, 2004 letter to Imo's counsel, plaintiffs' counsel identified these seven individuals and complained about the incurred charges for a share of premiums even though they were covered by the PCA.

Thomas Livingston, husband of the late Anne Livingston, was one of these seven employees. As an individual covered by the PCA and eligible for Medicare, Thomas Livingston began participating in the Secure Horizons Plan in August 1999. Imo, however, charged him annual premi-

---

Agreement and discovered that Plaintiff's counsel did not agree to allow the changes only to be made retroactive to April 1, 2001, rather than January 1, 2000."

18. Reviewing the distinctions in the 2004 Trigon Plan and the Aetna Plan, this court finds a genuine issue of material fact with respect to the plans' substantial similarity.

19. Plaintiffs identify additional differences. Having considered these as well as the aforementioned differences, this court finds a genuine issue of material fact as to whether the coverages are substantially similar to that provided "under the current medical plan" within the meaning of subparagraph 5(a) of the settlement agreement.

20. Plaintiffs set forth the facts regarding these seven individuals in paragraphs 43 through 49 of plaintiffs' statement of undisputed material facts. Imo did not controvert or object to the statements in a corresponding "concise statement of material facts" with "page references to affidavits, depositions and other documentation." LR. 56.1. The facts regarding these seven individuals are therefore admitted into the summary judgment record. *See Cochran v. Quest Software, Inc.*, 328 F.3d at 12; *Stonkus v. City of Brockton School Department*, 322 F.3d at 102. Imo also charged Joseph Fantucchio, a Medicare eligible former Imo employee covered by the PCA, a $5.00 premium during one month in 2000. (Docket Entry # 125, ¶ 50).

ums for the 2000 through 2003 plan years. Anne Livingston participated in the Trigon Plan until the end of April 2003 at which point she enrolled in a non-Imo Blue Cross Blue Shield Plan affiliated with her physician. As previously noted, the medical enrollment guide prohibited Imo employees from rejoining an Imo plan after leaving the plan.[21] Because she believed that Imo would not allow her to rejoin the Secure Horizons Plan when Imo reduced the premium to zero for her husband in 2004, she decided initially not to try to join the Secure Horizons Plan.

In the fall of 2004 or in the winter of 2005, however, the Livingstons discussed trying to determine if Anne Livingston could rejoin and thereby benefit from the premium free coverage Tom Livingston had at that time. On January 9, 2004, plaintiffs' counsel complained to Imo's counsel that not allowing "reenrollment" after a break in coverage on the part of the retiree violated the terms of the settlement agreement.[22] (Docket Entry # 137, Ex. U). Anne Livingston expended $2,464.94 in premiums between May 2003 and February 2005.

Effective January 1, 2003, the Secure Horizons Plan instituted a revised service coverage area. The revised service area excluded coverage for existing members in a number of towns including Middleborough, Massachusetts. David LeVangie ("LeVangie"), a former Imo employee listed on appendix A, was enrolled in the Secure Horizons Plan in 2002 and resided in Middleborough. (Docket Entry # 125, Ex. 46–48). In lieu of the Secure Horizons Plan, Imo offered LeVangie the Retiree Basic Plan at no premium cost[23] or the Retiree Premium Plan.

LeVangie chose the Retiree Premium Plan because it more closely resembled the benefits provided by the Secure Horizons Plan. (Docket Entry # 125, Ex. 47). The 2003 Retiree Premium Plan had an annual deductible of $209 per person and an out of pocket limit of $2,135 per person. The plan also imposed a 50% co-payment and $500 limit on prescription drugs purchased at a retail pharmacy and a 50% co-pay albeit no annual limit for prescription drugs purchased through the mail. (Docket Entry # 136). More notably, LeVangie paid annual premiums of $1,071.24, $1,899 and $2,004 respectively for the 2003, 2004 and 2005 Retiree Premium plans.[24] (Docket Entry # 125, ¶ 88).[25]

21. According to the enrollment guide, once an employee terminated or stopped medical coverage, he or she could "not start it at a later date." (Docket Entry # 125, Ex. 4).

22. Imo argues that notice of this claim was untimely under paragraph nine of the settlement agreement thereby barring the claim.

23. LeVangie testified that Imo offered him the basic plan which "was for nothing" or free. (Docket Entry # 125, Ex. 47). In 2003, the Retiree Basic Plan had a $135 deductible per person and a $2,135 out of pocket limit per person.

24. Another class member, Lois Walker ("Walker"), objected to the settlement agreement at the January 29, 1999 hearing. She complained about the lack of coverage because she moved to an area outside the Secure Horizons Plan coverage. At the hearing, the parties agreed to engage in a further review of the settlement agreement as it pertained to Walker. (Docket Entry # 125, Ex. 60).

25. Plaintiffs set forth the premium payments in paragraph 88 of plaintiffs' statement of undisputed material facts. Imo did not controvert or object to the statements in a corresponding "concise statement of material facts" with "page references to affidavits, depositions and other documentation." LR. 56.1. The amounts and the payments of the premiums are therefore part of the summary judgment record. *See* LR. 56.1; *Cochran v. Quest Software, Inc.,* 328 F.3d at 12; *Stonkus v. City of Brockton School Department,* 322 F.3d at 102.

By letter dated July 24, 2003, plaintiffs' counsel informed Imo's counsel that retirees were being forced to accept more costly medical coverage because the 2003 Secure Horizons Plan no longer covered certain areas. Plaintiffs' counsel also warned that costs imposed upon retirees "covered by the settlement agreement have increased substantially." (Docket Entry # 125, Ex. 51).

On January 9, 2004, plaintiffs' counsel wrote again to Imo's counsel complaining about the elimination of coverage in certain areas under the Secure Horizons Plan. The January 4, 2004 letter also notified Imo's counsel that: (1) certain retirees eligible to receive a pension and covered by the PCA were denied retiree medical coverage; (2) certain retirees on appendix A, i.e., covered by the PCA, have been charged premiums;[26] (3) the settlement agreement did not allow Imo to refuse medical coverage to a retiree after a break in coverage; and (4) the settlement agreement did not permit the increase in co-pays and deductibles and the elimination of certain coverage. (Docket Entry # 137, Ex. U).

Additional correspondence took place including a November 19, 2004 letter to Imo's counsel wherein plaintiffs' counsel enclosed copies of the motion for an order for compliance. On June 14, 2005, plaintiffs filed the motion for an order for compliance because Imo had failed to comply with the terms of the settlement agreement.

In seeking summary judgment, plaintiffs claim that Imo breached the settlement agreement by failing to provide lifetime medical benefits to the expanded class members, specifically those employees who were active employees at the time of the plant closing and listed in appendix A but who did not retire at that time. Second, Imo breached the terms of the settlement agreement when the HMO provider for retirees 65 years of age and older, the Secure Horizons Plan, discontinued coverage in certain geographical areas and additionally caused seven class members, covered by the PCA and Medicare eligible, to pay a share of the premiums for HMO coverage during certain periods of time. Third, Imo violated the terms of the settlement agreement by implementing health plans with reduced coverage and higher co-pays and deductibles which were not substantially similar to the plans in effect at the time of the settlement agreement. Fourth, Imo violated the terms of the settlement agreement by unilaterally implementing a rule prohibiting class members from rejoining any Imo health plan if they had previously dropped the coverage offered by Imo.

In addition to opposing summary judgment and seeking summary judgment on a number of the above claims, Imo seeks summary judgment that medical coverage, if any, to deferred vested pensioners[27] should commence at age 65. In other words, Imo maintains that if this court construes the settlement agreement to encompass Imo employees working at the time of the PCA but without eligibility, vested or otherwise, for pension coverage,

26. The retirees at issue are the aforementioned seven employees.

27. Throughout the summary judgment papers, the parties refer to "deferred vested pensioners." Imo argues that the settlement agreement does not apply to deferred vested pensioners while plaintiffs argue that it does. The settlement agreement, however, never uses the term "deferred vested pensioners." Instead, it defines the class members as including individuals "on Imo's active payroll and working as of May 16, 1990 and listed in Appendix A." This court therefore uses this language as opposed to the deferred vested pensioner language notwithstanding the overlap.

then this court should find that the eligibility age is 65 years old.

## DISCUSSION

### I. Coverage for Employees Listed in Appendix A

Plaintiffs argue that the settlement agreement unequivocally and unambiguously extends lifetime medical coverage to the Imo employees who were on Imo's active payroll as of May 16, 1990, and listed in appendix A. These individuals include employees that were not eligible to retire at that time including employees who did not have the five years of credited service to qualify for the vesting of a deferred vested pension. (Docket Entry # 127, n. 2).

Imo maintains that the settlement agreement is ambiguous. It also urges that plaintiffs' construction would lead to absurd consequences. Imo additionally contends that the claim as well as others are untimely under section nine of the settlement agreement.

■ "In construing a settlement subsequently adopted by a court, [the court] appl[ies] the same basic rules that govern the interpretation of ordinary contracts." *Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008); *accord AccuSoft Corp. v. Palo*, 237 F.3d 31, 40 (1st Cir.2001) (interpretation of settlement agreement is " 'akin to a contractual interpretation' "). " '[T]he usual considerations of contract interpretation' " thus apply to the interpretation of a settlement agreement, *AccuSoft Corp. v. Palo*, 237 F.3d at 40, as well as a stipulation between parties. *In re New Seabury Co. Limited Partnership*, 450 F.3d 24, 33 (1st Cir.2006) (stipulations "treated as contractual and are subject to the principles of contract interpretation"). The purpose of

a settlement agreement "is to fashion a final and permanent resolution of a dispute." *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 11 (1st Cir. 2000).

■ Although not identified by the parties, federal common law applies where, as here, the parties seek to enforce a settlement agreement based upon federal labor law and ERISA claims.[28] *See Morais v. Central Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d 709, 711 (1st Cir.1999) (federal common law applied to construction of "Settlement Agreement releasing Morais' ERISA-based claims"). "The relevant federal substantive law includes the common-sense canons of contract interpretation derived from state law, including the teaching that contracts containing unambiguous language must be construed according to their plain and natural meaning." *Morais v. Central Beverage Corp. Union Employees' Supplemental Retirement Plan*, 167 F.3d at 711 (internal quotation marks and citation omitted); *see Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008) ("federal common law requires us to be 'guided by common-sense canons of contract interpretation' "). Like any other contract, terms within a settlement agreement are "accorded their 'plain, ordinary, and natural meaning.' " *Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008) (interpreting settlement agreement).

■ Under federal common law, contract language is "ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Smart v. Gillette Co. Long–Term Disability Plan*,

---

**28.** In any event, the result would not be different if state law applied as evidenced by the cases cited infra applying state law.

70 F.3d 173, 178 (1st Cir.1995) (applying federal common law); *accord Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008) ("contract is ambiguous where the disputed terms are facially inconsistent or reasonably susceptible to multiple, plausible interpretations") (applying federal common law to settlement agreement); *see also Coll v. PB Diagnostic Systems*, 50 F.3d 1115, 1122 (1st Cir.1995) (agreement considered ambiguous where its "terms are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken") (applying Massachusetts law); *Rey v. Lafferty*, 990 F.2d 1379, 1384 (1st Cir.1993) (same). If a contract is ambiguous, the court "will consider extrinsic evidence to give effect to the parties' intent in forming the contract." *Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008). In other words, in the event an ambiguity exists, "the ultimate resolution of it typically will turn on the parties' intent" which "often (but not always) involves marshaling facts extrinsic to the language of the contract documents." *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d at 178; *accord Den Norske Bank AS v. First National Bank of Boston*, 75 F.3d 49, 52 (1st Cir.1996) (if court determines that contract language is ambiguous then the court may consider extrinsic evidence to ascertain the parties' intent) (applying Massachusetts law).

▉ Turning to the plain language of the settlement agreement, the sixth and seventh whereas paragraphs read together define the term "class" to "include additional individuals not encompassed within the original Class definition who were on Imo's payroll and working as of May 16, 1990 and listed in Appendix A to the Plant Closing Agreement negotiated between Imo and the Union." (Docket Entry # 125, Ex. 6). The sixth whereas paragraph equates the term "class" to the conditionally certified class of current and deceased retirees, spouses and dependents. The seventh whereas paragraph provides that the parties "stipulated to the modification of the Class" to include the additional individuals "listed in Appendix A" to the PCA. The corresponding language in the PCA dovetails this language by stating that the PCA's provisions "shall apply to Bargaining Unit employees on the active payroll and working as of May 16, 1990. A listing of such employees appears in Appendix A attached." (Docket Entry # 129). The natural and unambiguous meaning of the term "class" as defined in the settlement agreement therefore includes the active employees working as of May 16, 1990, who are listed in appendix A of the PCA.

Next, under the section "Terms of Settlement," the agreement sets out the overriding promise that "Imo shall provide to all *Class members* lifetime medical coverage under the current medical plan options offered to Retirees." (Docket Entry # 125, Ex. 6; emphasis added). Reading this promise together with the definition of the term class leads to the result that Imo promised to provide lifetime medical coverage "under the current medical plan options offered to retirees" to the employees active on "Imo's active payroll and working as of May 16, 1990 and listed in Appendix A to the [PCA]."[29] (Docket Entry # 125, Ex. 6).

Imo, however, insists that the settlement agreement does not provide retiree medical benefits to individuals who never qualified and who might never qualify for an Imo retirement form of pension. Imo accurately points out that both the CBA and the pension plan only provide for medical care for individuals who retired from Imo

---

**29.** The district judge drew an analogous conclusion in interpreting the similar language of the PCA's applicability clause. *See* fn. four and accompanying text.

and who qualified for a retirement form of pension, i.e., not a deferred vested pension. As explained earlier, appendix A includes a number of individuals who did not complete the five years of credited service required to qualify for a deferred vested pension under the pension plan. The appendix also includes individuals who might never receive an immediate pension upon retirement from Imo. Assuming this to be the case, Imo, a sophisticated entity represented by counsel throughout, nonetheless agreed to the terms of the settlement agreement. At the time of the settlement agreement, Imo knew the names of all of the individuals listed in appendix A, including how long these individuals had worked for Boston Gear and their ages.

Where, as here, "sophisticated business entities enter into a settlement agreement, they 'rely upon and have a right to expect a fairly literal interpretation of the bargain that was struck and approved by the court.'" *AccuSoft Corp. v. Palo,* 237 F.3d at 41. Thus, in the same manner that it "was incumbent upon the" party in *Nault* "to dispute any language that he did not wish included," *Nault v. U.S.,* 517 F.3d 2, 6–7 (1st Cir.2008), it was incumbent upon Imo and its counsel to dispute the language defining the term "class" as including the individuals listed in appendix A. Thus, Imo could have included language restricting the class to individuals who currently qualify for an immediate retirement. By not including the language that would have made the agreement less onerous, Imo must abide by the ordinary and clearly defined term "class" and the straight forward promise in the settlement agreement. *See Nault v. U.S.,* 517 F.3d 2, 6–7 (1st Cir.2008) (litigants entering into a settlement "must abide by terms of a settlement even where they prove more onerous than originally anticipated").

The straight forward definition of "class" includes the individuals listed in appendix A. The agreement sets out the simple promise in mandatory terms that Imo "shall" provide class members with lifetime medical coverage. Simply put, the language in the settlement agreement defining the "class" to include active employees listed in appendix A and promising the class "lifetime medical coverage" is not ambiguous.

Imo's attempt to establish an ambiguity by virtue of the language in the first whereas paragraph is not convincing. The paragraph simply points out that Imo has provided lifetime medical benefits to retirees in the past pursuant to several CBAs prior to the settlement agreement. Subparagraph 5(a) under the "Terms of Settlement" section unequivocally and unambiguously lays out Imo's responsibility to provide lifetime medical benefits to all class members going forward.

Imo next argues that enforcing the settlement agreement would lead to absurd and commercially unreasonable results. According to Imo, this court must therefore go beyond the agreement to consider extrinsic evidence to determine the parties' true intent. The absurd results Imo identifies, as noted above, consist of the obligation to provide medical coverage to all of the employees listed in appendix A including employees who will never retire from Imo and who did not qualify for an immediate or even a deferred vested pension at the time of the settlement.

It is true that "in the exceptional case, a latent ambiguity in seemingly clear contract language may require [the court] to consider extrinsic evidence to determine the actual object of the parties' agreement." *Nault v. U.S.,* 517 F.3d 2, 7–8 (1st Cir.2008). The proposed interpretation to exclude deferred vested as well as nonvested pensioners, however, conflicts with the plain meaning of the definition of the term "class" in the agreement to include individ-

uals "who were on Imo's active payroll" and "listed in Appendix A" (Docket Entry # 125, Ex. 6). *See Nault v. U.S.*, 517 F.3d 2, 7–8 (1st Cir.2008) ("Nault's proposed interpretation" in support of the absurdity argument "is not merely strained, but flatly contradictory to the plain meaning of its terms").

In addition, like the extrinsic evidence in *Nault*, the extrinsic evidence is not as conclusive or uniform to the degree asserted by Imo. The August 12, 1998 letter from Imo's counsel relied upon by Imo can be read in more than one way. As already noted, the letter suggests the expansion of the class "to include those employees covered by" the PCA "but who had not yet retired at the time the class was certified" because these "individuals arguably are entitled to some form of medical coverage upon retirement...." (Docket Entry # 132, Ex. E). Broadly read, the letter encompasses individuals who had not retired and who were covered by the PCA. The applicability clause establishes that the individuals covered by the PCA are those listed in appendix A.[30]

In sum, the language means what it says. Imo promised to provide "all Class members lifetime medical coverage." (Docket Entry # 1265, Ex. 6). Such class members include all of the individuals "working as of May 16, 1990 and listed on appendix A of the [PCA]." (Docket Entry # 1265, Ex. 6). Imo therefore violates the settlement agreement if it fails to provide

an individual listed in appendix A with lifetime medical coverage "under the current medical plan options offered to Retirees" or "substantially similar coverage." (Docket Entry # 125, Ex. 6).

## II. *Notice to New Retirees*

█ In seeking summary judgment, plaintiffs argue that the settlement agreement obligates Imo to provide new retirees notice of their right to receive medical coverage under the settlement agreement at the time these individuals retire or become eligible to receive retiree medical coverage. Plaintiffs thus maintain that the agreement imposes an ongoing duty upon Imo to notify the individuals listed in appendix A.[31]

The plain language of the settlement agreement, however, only requires Imo to provide notice to all class members of the proposed settlement. As stated in paragraph two in the "Preliminary Order" section of the settlement agreement, "Imo will cause to be mailed to each member of the Class a Notice of Proposed Settlement of Class Action in a form to be approved by the Court."[32] (Docket Entry # 125, Ex. 6). The settlement agreement does not set forth any express obligation to provide notice to class members about the medical coverage after court approval of the final settlement.

Notwithstanding this silence, plaintiffs argue that the obligation to provide "all Class members lifetime medical coverage

---

**30.** The letter also supports plaintiffs' interpretation regarding the eligibility date to receive benefits discussed infra.

**31.** According to plaintiffs:

It requires nothing but common sense to understand that if the Defendant is obligated to provide these health benefits, it is also obligated to notify these Class members when they become eligible to receive the benefits and provide these eligible employees with their enrollment options and infor-

mation. Imo has failed to do so and is in violation of the Settlement Agreement.
(Docket Entry # 127).

**32.** The fact that Imo did not comply with this obligation and notify all of the individuals listed in appendix A may provide "good cause" within the meaning of section 9(e) of the settlement agreement. As discussed infra, the existence of good cause is an genuine issue of material fact and therefore for the finder of fact.

under the current medical plan options offered Retirees" creates or implies an obligation upon Imo to provide notice. To support such a reading, plaintiffs point to Imo's practice of counseling employees seeking to retire about their retirement benefits including their retiree medical benefits.

Plaintiffs' failure to anchor the alleged violation of the settlement agreement upon any language regarding a duty to require notice after the court approves the final settlement agreement is fatal to this claim. The obligation "to provide ... lifetime medical coverage under the current medical plan options offered to Retirees" refers to the plan options offered retirees as opposed to the notice such retirees may get from the company about the options available. Without more, the language does not obligate Imo to provide notice in the future to all individuals in appendix A of their right to receive medical coverage at the time these individuals retire or become eligible for the coverage. Such individuals receive or should have received the notice of the proposed settlement as "a member of the Class" under paragraph two of the settlement agreement of their right to "lifetime medical coverage."[33] (Docket Entry # 125, Ex. 6). The settlement agreement does not expressly require additional notice in the future. The parties to the settlement agreement knew how to impose a notice obligation yet chose to limit that obligation to the requirement in paragraph two. A practice of advising class and non-class members about medical coverage upon retirement from Imo

does not sufficiently rebut the foregoing evidence that the parties did not intend to impose an ongoing duty upon Imo to provide notice.

Plaintiffs fail to carry their burden on summary judgment with respect to establishing that Imo breached the agreement by not providing new retirees notice of their medical coverage at the time they retired or became eligible for coverage. Nor, absent legal authority,[34] will this court impose an ongoing duty upon Imo to provide such notice in the future inasmuch as the settlement agreement is silent with respect to such a duty.

## III. *Eligibility Date*

■ Having construed the settlement agreement to provide medical coverage to the individuals listed in appendix A, it is necessary to determine the eligibility date for such coverage. Plaintiffs contend that "the proper eligibility guideline should be the receipt of the employee's deferred vested benefit from the Pension Plan." (Docket Entry # 143). Imo, in turn, submits that age 65 is the proper eligibility date.

The dispute as to when the medical benefits apply between the parties applies only to class members who have not yet retired. Plaintiffs admit that "the undisputed evidence is that the Retirees became eligible for their lifetime medical coverage upon their retirement from the Company." (Docket Entry # 143, p. 6).[35]

The settlement agreement does not contain an express eligibility date for individu-

---

**33.** It is an issue for the finder of fact to consider Imo's failure to provide notice to a person listed in appendix A about the proposed settlement and the availability of medical coverage therein creates sufficient good cause to excuse that person's failure or delay in complying with section nine of the settlement agreement.

**34.** Plaintiffs do not cite a single case in this section of the supporting memorandum.

**35.** This court finds, in its discretion, that this undisputed representation constitutes an admission. *Taylor v. Blakey*, 490 F.3d 965, 973 (D.C.Cir.2007) (noting in parenthetical that "representation in brief may be treated as admission on file" within meaning of Rule 56(c)); *Stallard v. U.S.*, 12 F.3d 489, 496 n. 27

als who have not retired. It does, however, state that Imo shall provide the class members medical coverage "under the current medical plan *options* offered to Retirees." (Docket Entry # 125, Ex. 6; emphasis added). Class members therefore receive the same or substantially similar plan options that retirees receive under the current retiree medical plan.

The borrowed or referenced medical plan options depend upon whether the individual is under age 65 or age 65 and older. *See, e.g., Filiatrault v. Comverse Technology, Inc.,* 275 F.3d 131, 135 (1st Cir.2001) (plain meaning of term in ERISA plan defined the term by borrowing definition from another document, which the court examined, without considering the document extrinsic evidence). In pertinent part, the retiree medical plan summarizes the options in a boxed section appearing on pages one and two. The section is captioned "An Overview of Your Retiree Medical Plan *Options.*" (Docket Entry # 125, Ex. 4; emphasis added). The box then divides the options into two and only two categories. The first category of options applies "If You Are Age 65 or Over." [36] The second category of options applies "If You Are Under Age 65." [37] Listed under each category are the op-

tions. Eligibility for an option under the current medical plan offered retirees depends entirely upon whether the employee is "Age 65 or Over" or "Under Age 65."

Language in the settlement agreement also sets out the premium and cost sharing provisions into three groups: (1) "Retirees and spouses" who are age 65 and older covered by the PCA; (2) "Retirees and spouses" who are age 65 and over and not covered by the PCA; and (3) "Retirees and spouses" who are under age 65. The premium and cost sharing provisions of the settlement agreement uniformly depend upon whether the retiree or over or under the age of 65.

The language "lifetime medical coverage under the current medical plan options offered to Retirees" can also reasonably equate to the eligibility for coverage under the retiree medical plan as opposed to the eligibility for options under the retiree medical plan. Eligibility for coverage under the retiree medical plan depends upon receipt of an immediate pension.[38] Accordingly, as urged by plaintiffs, the date when non-retired appendix A individuals become entitled to lifetime medical coverage may arise at the time these individuals begin receiving a pension, deferred or otherwise, from the pension plan.[39]

(5th Cir.1994); *United States v. One Heckler–Koch Rifle,* 629 F.2d 1250, 1253 (7th Cir. 1980); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane *Federal Practice and Procedure* §§ 2722 & 2723 (1998).

**36.** The box lists the options for the category "Age 65 or Over" as the Retiree Basic Plan, the Retiree Premium Plan and a "Medicare-approved HMO (where available)." (Docket Entry # 125, Ex. 4).

**37.** The box lists the options for the category "Under Age 65" as the Comprehensive Medical Plan and an "HMO (where available)." (Docket Entry # 125, Ex. 4).

**38.** In pertinent part, the medical plan states that, "You are eligible for Imo retiree medical

coverage if you received an immediate pension from the company and were participating in an Imo-sponsored medical plan on your last day as an active employee." (Docket Entry # 125, Ex. 4).

**39.** In accordance with federal common law, this court can examine the pension plan for the purpose of determining whether an ambiguity exists. *See Smart v. The Gillette Company Long–Term Disability Plan,* 70 F.3d at 179 ("if the evidence is not offered to infuse the contract with meaning, but only to demonstrate that a term is vague or ambiguous in the first place, then the situation may be different").

The language in the foregoing provisions of the settlement agreement with respect to the eligibility date for individuals listed in appendix A who have not retired is therefore ambiguous. In other words, it can support "reasonable differences of opinion as to the meaning of the words employed and obligations undertaken." *Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d at 178.

Although Imo argues that "deferred vested pensioners" may never retire from the company (Docket Entry # 141), Imo does not provide evidence to support this assertion.[40] The pension qualifications of the individuals listed in appendix A are not in the summary judgment record.

Where, as here, an ambiguity exists, "the ultimate resolution of it typically will turn on the parties' intent" and include "marshaling facts extrinsic to the language" of the settlement agreement. *Smart v. Gillette Co. Long–Term Disability Plan,* 70 F.3d at 178. The extrinsic evidence is not entirely one sided. The pension plan defines normal retirement age as age 65. The plan, however, also awards retirement benefits at times other than at age 65. The provisions of the retiree medical plan depend upon age 65 with respect to options provided and receipt of an immediate pension with respect to eligibility for medical coverage. Although the weight of the evidence favors Imo's interpretation, the issue is subject to reasonable differences of opinion and is therefore for the finder of fact at trial.

## IV. *Seven Employees Charged Premiums*

Plaintiffs seek summary judgment that Imo breached the settlement agreement by charging premiums to seven former Imo employees. Imo does not adequately address this particular claim regarding charging the seven employees premiums.

The employees are listed in appendix A of the PCA, Medicare eligible and enrolled in one or more of the Secure Horizons plans. In the event these employees were enrolled in "the current standard HMO option," Imo must "pay the full premium." Plaintiffs' summary judgment motion is allowed to this extent.

## V. *Geographic Area*

Plaintiffs next seek summary judgment on the basis that Imo breached the settlement agreement by not providing LeVangie with substantially similar coverage after the Secure Horizons Plan discontinued coverage for his area. In opposition to plaintiffs' summary judgment motion, Imo contends that the claim is time barred by the provisions of subparagraphs 9(a) through (c). (Docket Entry # 141, § II(A)). Imo separately moves for summary judgment on the claim based upon the same deficiencies. (Docket Entry # 139, § II(A)).

In the July 24, 2003 letter, plaintiffs' counsel informed Imo's counsel that retirees were being forced to accept more costly medical coverage because the 2003 Secure Horizons Plan no longer covered certain areas. Plaintiffs' counsel repeated the claim in the January 9, 2004 letter to Imo's counsel. There is no indication that plaintiffs' counsel, Imo's counsel and Le-Vangie discussed the matter within 60 days of either letter. By letter dated December 14, 2004, Imo's counsel states in no uncertain terms that he would treat the November 19, 2004 letter "as a notice for purposes of Section 9(b) [of the settlement agreement]." (Docket Entry # 143, Ex. 6). On June 14, 2005, plaintiffs filed

---

**40.** Imo moves for summary judgment that the eligibility age for deferred vested pensioners be age 65. While this certainly may be true, the record is disputed and the language in the settlement agreement ambiguous.

the motion for an order for compliance thereby submitting the claim to this court.

As explained in the background section, the settlement agreement sets out certain procedures to resolve disputes. Subparagraph 9(a) requires the person asserting the claim to give written notice to class counsel no later than "the circumstances giving rise to the claim or question of interpretation or applicability have occurred." (Docket Entry # 125, Ex. 6). Subparagraph 9(b) requires Imo's counsel as well as plaintiffs' counsel and the person raising the claim to discuss the issue within 60 days in an attempt to reach an agreed resolution. Subparagraph 9(c) requires submission to the court within 60 days thereafter "[i]f no resolution is reached." (Docket Entry # 125, Ex. 6). The time periods "may be extended by agreement of the parties or by the Court for good cause shown." (Docket Entry # 125, Ex. 6, ¶ 9(e)).

The plain meaning of the language of paragraph nine sets up a mandatory and required procedure. The paragraph prefaces subparagraphs 9(a) through (c) with the language that, "Should a dispute of any nature whatsoever arise" concerning compliance with the settlement agreement, "it shall be resolved exclusively and mandatorily in the following manner." (Docket Entry # 125, Ex. 6).

On the other hand, the language in subparagraph 9(e) states that "paragraph 9 shall not be construed to limit or shorten any statute of limitations applicable to disputes concerning written agreements, including this Stipulation and Agreement

..., or to impair the right, if any, of any party to seek recovery of attorneys' fees...." (Docket Entry # 125, Ex. 6).

The provisions in subparagraphs 9(a) through (c), which establish a mandatory and exclusive procedure to resolve disputes concerning compliance with the settlement agreement, are facially inconsistent with the provisions of subparagraph 9(e), which state, again in mandatory terms, that paragraph nine "shall not be construed" to shorten the statute of limitations applicable to written agreements[41] including the settlement agreement. The procedures in subparagraphs 9(a) through (c), however, do just that because they cut off resort to the court on the basis of failing to comply with the time limits in these subparagraphs. Because the provisions are "facially inconsistent," the settlement agreement is ambiguous with respect to the resolution of disputes.[42] *Nault v. U.S.*, 517 F.3d 2, 4 (1st Cir.2008) ("contract is ambiguous where the disputed terms are facially inconsistent or reasonably susceptible to multiple, plausible interpretations").

Imo posits two arguments to avoid the inconsistency and ambiguity inherent in the language of paragraph nine. First, Imo submits that the parties intended the language of subparagraph 9(e) to mean that ERISA claims for medical coverage under an ERISA plan remain subject to the six year statute limitations for wrongfully denied benefits. The language in subparagraph 9(e) regarding the statute of limitations, however, applies to "this Stipulation and Agreement" (Docket Entry

---

41. A six year period applies to contract disputes under state law. Mass. Gen. Laws ch. 260, § 2. A six year period also applies to ERISA wrongful denial of medical benefits claims under federal common law. *Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc. Retirement Income Trust,* 134 F.Supp.2d 189, 208 (D.Mass.2001).

42. Plaintiffs similarly argue that there is "an inherent ambiguity" between the provisions in subparagraphs 9(a) through (c) and the limitations provision in subparagraph 9(e). (Docket Entry # 143, n. 5).

# 125, Ex. 6) and therefore does not limit itself to ERISA denial of benefits claims.

Imo next contends that the limitations provision in subparagraph 9(e) simply ensures that a limitations period will not "cut short" negotiations toward the "agreed resolution" in subparagraph 9(b). The six year limitations period for a wrongful denial of retiree medical benefits claim under ERISA typically "does not accrue under ERISA until there has been a denial of benefits." *Laurenzano v. Blue Cross and Blue Shield of Massachusetts, Inc. Retirement Income Trust*, 134 F.Supp.2d at 208. A number of courts of appeals determine "the date of denial by applying the discovery rule, which asks when the plaintiff knew, or reasonably should have known, about the injury that is the basis of his cause of action." *Id.; see McLaughlin v. Unum Life Ins. Co. of America*, 224 F.Supp.2d 283, 288 (D.Me.2002) ("[c]onsistent with the 'discovery rule,' the general rule in an ERISA action is that a cause of action accrues after a claim for benefits has been made and formally decided"); *see also Edes v. Verizon Communications, Inc.*, 288 F.Supp.2d 55, 59 (D.Mass.2003). The discovery rule applied to ERISA denial of medical benefits claims thereby corresponds to the similar language in subparagraph 9(a) which triggers the dispute resolution process at the time "the circumstances giving rise to the claim ... have occurred." (Docket Entry # 125, Ex. 6, ¶ 9(a)). It is difficult to imagine how the six or even a three year limitations period would "cut short" the dispute resolution process which begins when circumstances giving rise to the claim occur. The negotiations towards "an agreed resolution" under subparagraph 9(b) would have to last for years as opposed to the anticipated two months. Imo's construction thus renders the language superfluous. *See Harris v.*

*The Epoch Group, L.C.*, 357 F.3d 822, 825 (8th Cir.2004) (interpreting terms in ERISA plan and noting that "under federal common law 'a contract should be interpreted as to give meaning to all of its terms-presuming that every provision was intended to accomplish some purpose, and that none are deemed superfluous' ").

Accordingly, in light of the facial inconsistency, the limitations provision in paragraph nine is ambiguous. Neither party points to extrinsic evidence to resolve the ambiguity as to what the parties intended the limitations provision to mean. Nor do the parties adequately brief the argument.

This court need not resolve the inconsistency with respect to the geographic area claim, however, because the existence of "good cause shown" presents a genuine issue of material fact. First, Imo acknowledges that it failed to provide "deferred vested employees" notice of the proposed settlement (Docket Entry # 141, p. 7) which leads to the reasonable inference that LeVangie may not have received notice of the settlement until at or around the time of the July 24, 2003 letter referencing the claim.[43] The issue of "good cause shown" to excuse compliance with subparagraph 9(a) therefore presents a genuine issue of material fact.

There is little evidence in the record that "Class counsel and counsel for Imo, with the participation" of Levangie discussed the matter within 60 days of either the July 2003 letter or the January 2004 letter. Plaintiffs' counsel raised the issue again in a November 19, 2004 letter by attaching the motion for an order of compliance.

More importantly, by letter dated December 14, 2004, Imo's counsel states in no uncertain terms that he would treat the

---

**43.** Thus, even if he was aware of the change in service area in January 2003, as argued by Imo, the presence of "good cause" remains a genuine issue of material fact.

November 19, 2004 letter "as a notice for purposes of Section 9(b) [of the settlement agreement]." (Docket Entry # 143, Ex. 6). Accordingly, a reasonable finder of fact could conclude that the parties "extended by agreement" (Docket Entry # 125, Ex. 6, ¶ 9(e)) the 60 day time limit in subparagraph 9(b) to the date of the November 19, 2004 letter.

The December 14, 2004 letter further states that Imo needed certain affidavits and exhibits "to explore this matter constructively." (Docket Entry # 143, Ex. 6). The events between December 14, 2004 and the June 15, 2005 submission of the motion for an order of compliance to the court are unclear. As indicated in the December 2004 letter, this court draws the reasonable inference that the parties continued to explore and exchange documents concerning the numerous claims raised in the attached copy of the motion for an order of compliance. At a minimum, therefore, the existence of "good cause shown" to extend the 60 day time period in subparagraph 9(c) constitutes a genuine issue of material fact. In light of these genuine issues of material fact as to timeliness, it is not necessary to address the substance of the claim at this time.[44]

As a final matter regarding this claim, Imo argues that plaintiffs failed to amend the settlement agreement to accommodate the effect of an HMO's change in service area even though plaintiffs were "on notice" of the issue because of Walker's objection to the proposed settlement. Imo fails to offer any legal authority to support the latter argument as required under LR. 7.1(b)(2). The foregoing genuine issues of material fact preclude the need to address

the argument. Alternatively, the argument fails due to the failure to comply with LR. 7. 1(b)(2).

VI. *Substantial Similarity and Retroactivity*

■ In seeking summary judgment, plaintiffs contend that Imo breached the settlement agreement's requirement that the medical coverage remain "substantially similar." Plaintiffs argue that substantial similarity is lacking as a result of the changes implemented in the Secure Horizons Plan for individuals age 65 and older and the vision changes made to the 2004 Trigon Plan for individuals under age 65. They also submit as a matter of law that the retroactivity date for the changes to the Trigon Plan is January 1, 2000 as opposed to April 1, 2001.

As explained in the background section and in footnotes 12 and 18, whether the changes in the Secure Horizons Plan or the changes between the Aetna Plan and the 2004 Trigon Plan constitute "substantially similar coverage" within the meaning of subparagraph 5(a) of the settlement agreement is a genuine issue of fact. Such genuine issues exist whether this court employs the aggregate analysis urged by Imo or the analysis urged by plaintiffs. As explained in footnote 15, genuine factual issues also exist with respect to the whether parties agreed to make the changes to the Trigon Plan retroactive to January 1, 2000.[45] Plaintiffs are therefore not entitled to summary judgment on these claims.

Imo separately moves for summary judgment on the basis that the substitution

---

**44.** Imo does not argue that the "the current medical plan options offered to Retirees" (Docket Entry # 125, Ex. 6, ¶ 5(a)) may only have offered HMO coverage "where available" (Docket Entry # 125, Ex. 4, pp. 1–2).

This court declines to address the argument sua sponte.

**45.** Genuine issues of fact also exist as to whether the changes amounted to "substantially similar coverage." *See* fn. 12.

of the Trigon Plan for the Aetna Plan did not violate the substantial similarity requirement. (Docket Entry # 139, § II(B)). Again, the presence of a genuine issue of material fact regarding whether the Trigon Plan provided "substantially similar coverage" precludes summary judgment in Imo's favor.[46]

Imo additionally moves for summary judgment on the claim that the changes between the Aetna Plan and the Trigon Plan went into effect in January 1, 2000, as opposed to April 1, 2001.[47] (Docket Entry # 139, § II(A), pp. 16–19). Imo argues that the claim is untimely because plaintiffs did not comply with the dispute resolution procedure in paragraph nine of the settlement agreement with respect to the claim involving the substantial similarity of the Trigon Plan to the Aetna Plan. (Docket Entry # 139, § II(A)).

With respect to subparagraph 9(a), plaintiffs' counsel complained to Imo's counsel about the increased co-pays and deductibles in the January 18, 2000 letter. After plaintiffs' and Imo's counsel negotiated the issue in the spring of 2000, on September 6, 2001, the Imo retiree service center informed all Boston Gear union retirees, including Young, that the changes made to the Trigon Plan to more closely match the Aetna Plan took effect on April 1, 2001. Young did not contact plaintiffs' counsel until 2003 because he believed, mistakenly, that plaintiffs' counsel had agreed to the April date during the negotiations. It was not until Young reconnected with plaintiffs' counsel in 2003 that Young realized that plaintiffs' counsel had

not agreed to the April 1, 2001 retroactive date.

Subparagraph 9(a), however, requires that, "The party, person or entity asserting the claim ... shall serve written notice to Class Counsel" no later than 90 days "after the circumstances giving rise to the claim ... occurred." Young knew about the settlement agreement and the existence of a process in that agreement to raise disputes. He also knew about the negotiations to resolve the effective date of the agreed changes. When he received the September 6, 2001 letter notifying him about the April 1, 2001 effective date, he did not contact or attempt to contact plaintiffs' counsel because he assumed, in error, that plaintiffs' counsel agreed to the April 1, 2001 date. The "circumstances giving rise to the claim" within the meaning of subparagraph 9(a) therefore occurred in September 2001 when Young knew that the changes would not be made retroactive to January 1, 2000. Young did not contact plaintiffs' counsel until 2003. Plaintiffs therefore did not comply with subparagraph 9(a).

Plaintiffs attempt to show "good cause" to avoid the time constraints of subparagraph 9(a) by explaining that Imo's counsel failed to properly communicate the decision to retroactively apply the changes.[48] Plaintiffs point out that Imo only notified the retirees as opposed to retirees and plaintiffs' counsel. Such circumstances do not provide sufficient evidence to allow a reasonable finder of fact to decide the issue in plaintiffs' favor. Subparagraph 9(a) requires notice by the party to plain-

---

46. *See* fn. 12.

47. The claim appears as claim one in attachment A to the joint discovery plan. (Docket Entry # 112).

48. As previously noted, the May 2001 letter expressly addressed only the issue of the 90

day supply of medication at retail pharmacies as opposed to the other issue identified in plaintiffs' counsel's April 11, 2000 letter, i.e., whether the adjustment should take effect on January 1, 2000. In September 2001, Imo notified retirees, as opposed to plaintiffs' counsel, about the April 1, 2001 effective date.

tiffs' counsel as opposed to notice by Imo to plaintiffs' counsel. The length of time between September 2001 and July 2003, the date asserted by plaintiffs (Docket Entry # 143, § III(A)(1)), spans a period of years as opposed to months. In September 2001, Young knew about the process to raise claims, he knew about the April 1, 2001 effective date and he believed that the retroactivity to April 1, 2001 as opposed to January 1, 2000, was not consistent with the settlement agreement. (Docket Entry # 125, Ex. 2). There is no "good cause shown" and Imo is therefore entitled to summary judgment to this extent.

There is, however, a facial inconsistency in the limitations language of paragraph 9(e) and the language of subparagraph nine imposing the exclusive and mandatory dispute resolution process. Neither party adequately addresses this issue. In seeking summary judgment, Imo's arguments about the limitations provision are, as previously explained, not convincing.

It is true that, "Issues of timely filing may be decided under Rule 56 if the relevant facts are sufficiently clear." *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir.1990) (affirming district court's summary judgment of Title VII claim as untimely); *accord Mack v. Great Atlantic and Pacific Tea Company, Inc.*, 871 F.2d at 181 ("[p]reclusory time bars are appropriately examined under Rule 56 if the relevant facts are sufficiently clear"). The facts in the case at bar, however, are not reasonably clear and Imo fails to proffer an alternative legal argument to resolve the facial inconsistency. Accordingly, Imo is not entitled to summary judgment on the entirety of the retroactivity claim (Docket Entry # 112, Att. A, Claim One) on the basis of untimeliness.

## VII. *Livingston's Opt Out Claim*

Both parties move for summary judgment on the claim that Livingston is not allowed to rejoin the Imo retiree medical coverage because she left the plan in 2003. Plaintiffs argue that Imo breached the settlement agreement by not allowing Livingston to rejoin the plan in 2004 or 2005.

Imo additionally submits that the claim is untimely because plaintiffs did not comply with the procedures in section nine of the settlement agreement. On the merits, Imo relies on the language in the plan [49] and in the annual notices to retirees that a retiree cannot reinstate coverage once the retiree decides to terminate coverage.[50]

Addressing the untimeliness claim, the January 9, 2004 letter from plaintiffs' counsel complained about the language in the annual notices that prevents a retiree from rejoining the plan after a break in coverage.[51] Imo points out that it notified retirees about the inability to reinstate coverage as early as 1999.[52] According to Imo, raising the claim in a January 2004 letter therefore violates the timeliness provisions of paragraph nine.

First, Anne Livingston did not attempt to rejoin the plan until the fall of 2004 at the earliest because that was when the Livingstons found out that "she wouldn't have to pay any money." (Docket Entry

---

**49.** *See* fn. 21.

**50.** Annual notices to retirees in 1999, 2000, 2001 and 2002 uniformly advise retirees that, "If you decide to drop your Imo retiree medical and/or your life insurance coverage and no longer pay your monthly premiums, you will *not* be able to reinstate coverage at a later date." (Docket Entry # 136, Ex. I & T).

**51.** The letter did not mention Anne Livingston.

**52.** Although the brief refers to 1998, the documents submitted to support the argument date from 1999 to 2001.

# 125, Ex. 40). . Prior to 2004, Imo had, in error, been charging Thomas Livingston a share of the premiums. Moreover, on its face, the settlement agreement requires that, "Imo shall provide to all Class members lifetime medical coverage under the current plan options offered to Retirees." Although the annual notices and the statement in the enrollment guide prohibit a retiree from rejoining after a break in coverage, there is little indication that the "plan options" prohibit a retiree from rejoining. Such circumstances therefore create a genuine issue of fact as to the existence of "good cause shown" with respect to compliance with subparagraph 9(a).

Compliance with subparagraph 9(b) also presents a genuine issue of material fact. For reasons previously explained, the December 14, 2004 letter treats the November 19, 2004 letter "as a notice for purposes of Section 9(b)." As to subparagraph 9(c), the exploration of a resolution and exchange of documents thereafter evidences but does not establish either an "agreement of the parties" or "good cause shown" within the meaning of subparagraph 9(e) to excuse any failure to comply with the 60 day deadline in subparagraph 9(c).

## CONCLUSION

To the extent and for reasons stated in the body of this opinion, plaintiffs' motion for summary judgment (Docket Entry # 124) is **ALLOWED** in part and **DENIED** in part. Imo's motion of summary judgment (Docket Entry # 126) is **ALLOWED** in part and **DENIED.** The parties shall appear for a status conference to set a trial date on April 29, 2008, at 2:30 p.m.